107 F.3d 1147
 65 USLW 2647, 46 Fed. R. Evid. Serv. 885
 UNITED STATES of America, Plaintiff-Appellee,
v.
Kathleen Kremser JONES, Defendant-Appellant.
 No. 95-6096.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 24, 1996.
Decided March 3, 1997.
 
 J. Edgar Schmutzer, Asst. U.S. Attorney (argued and briefed), Knoxville, TN, for plaintiff-appellee.
 Elizabeth B. Ford, Asst. Federal Public Defender (briefed), Leah J. Prewitt (argued), Knoxville, TN, for defendant-appellant.
 Before: KRUPANSKY, DAUGHTREY, and MOORE, Circuit Judges.
 MOORE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. KRUPANSKY, J. (pp. 1165-71), delivered a separate opinion concurring in part and dissenting in part.
 MOORE, Circuit Judge.
 
 
 1
 Appellant Kathleen Jones appeals her numerous criminal convictions, all of which stemmed from her involvement in credit card fraud. In addition, she also appeals her sentence imposed by the district court. She contends that the district court erred in two of its evidentiary rulings relating to documents that purportedly contained her signature, and that it erred by enhancing her sentence based on time she spent in home detention. We conclude that the district court did not err in its evidentiary rulings, and thus affirm her convictions in all respects, but we reverse the enhancement of her sentence based on her time spent in home detention and remand for resentencing.
 
 I. BACKGROUND
 
 2
 Appellant Kathleen Jones stole a credit card application from the mailbox of her son-in-law's aunt and uncle, fraudulently applied for the credit card under their names, and made twenty charges on the credit card between July 8, 1991, and July 21, 1991, for ATM withdrawals and hotel visits. The total amount charged on the credit card was $3,748.08. J.A. at 110. Jones was convicted of one count of mail fraud, in violation of 18 U.S.C. § 1341; two counts of using a fictitious or false name in order to carry on a scheme to defraud by mail, in violation of 18 U.S.C. § 1342; one count of using an unauthorized access device, in violation of 18 U.S.C. § 1029(a)(2); one count of possessing stolen mail, in violation of 18 U.S.C. § 1708; and one count of obstruction of correspondence, in violation of 18 U.S.C. § 1702. J.A. at 30-31.
 
 
 3
 One of the government's primary arguments at trial was that Jones's signature was on: (1) the credit card application; (2) a post-office box registration form for the post-office box to which the card was sent; and (3) two Howard Johnson's motel registration forms, which contained the fraudulently procured Visa number at issue. To prove that these items contained Jones's signature, Grant Sperry, a forensic document analyst for the United States Postal Service, testified as an expert witness for the government. He compared the three signatures at issue with documents purportedly written by Jones and concluded that her signature was on all of the documents. The parties stipulated to the admissibility of two of the writings used by Sperry, Government Exhibit 11, known business writings of defendant, and Government Exhibit 12, handwriting exemplars obtained by postal inspectors. The defendant, however, refused to stipulate to the admissibility of a third document used by Sperry, a card allegedly sent by Jones to Bruce Cronin, whose son is married to Jones's daughter. The card was admitted into evidence through Cronin, who testified that while he was not familiar with Jones's signature, he knew the card was sent by Jones based on its content.
 
 
 4
 Appellant contends that the district court erred in admitting the card because Cronin, a lay witness, was not familiar with her signature. She also asserts that Sperry's expert testimony was inadmissible under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because it was not sufficiently reliable. In addition to appealing her convictions on the various charges, appellant contends that the district court miscalculated her criminal history score under the United States Sentencing Guidelines by counting as a prior "sentence of imprisonment" a sentence she served in home detention pursuant to Tennessee's Community Alternatives to Prison Program ("CAPP"). We first address the district court's evidentiary rulings.
 
 
 5
 II. AUTHENTICATION THROUGH LAY WITNESS TESTIMONY
 
 
 6
 Appellant asserts that the district court erred by allowing into evidence the card allegedly written by Jones to Cronin because it had not been properly authenticated. According to her, because Cronin was a non-expert who was unfamiliar with Jones's handwriting, he could not testify regarding the genuineness of the card. Whether a document has been properly authenticated is a preliminary determination to be made by the district court. See United States v. Carriger, 592 F.2d 312, 316 (6th Cir.1979); Fed.R.Evid. 901(a) advisory committee's note. In reviewing a ruling by the district court regarding the authenticity of a document, we will affirm that ruling unless the district court abused its discretion. United States v. Maldonado-Rivera, 922 F.2d 934, 957 (2d Cir.1990), cert. denied, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991), and cert. denied, 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025, 1026 (1991).
 
 
 7
 Under Federal Rule of Evidence 901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b) in turn lists the following examples of authentication or identification conforming with the requirements of this rule:
 
 
 8
 (2) Nonexpert opinion on handwriting. Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.
 
 
 9
 ....
 
 
 10
 (4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.
 
 
 11
 It is clear that Rule 901(b)(2) does not apply, because Cronin himself admitted that he was not familiar with Jones's handwriting. J.A. at 162. Appellee argues, however, and we are convinced, that Rule 901(b)(4) applies. "[A] document ... may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him...." Fed.R.Evid. 901(b)(4) advisory committee's note. In Maldonado-Rivera, the Second Circuit stated:
 
 
 12
 In accordance with Rule 901(b)(4), "the contents of a writing may be used to aid in determining the identity of the declarant," United States v. Wilson, 532 F.2d 641, 644 (8th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), if, for example, the writing "deal[s] with a matter sufficiently obscure or particularly within the knowledge of the persons corresponding so that the contents of the [writing] were not a matter of common knowledge[.]" 5 J. Weinstein & M. Berger, Weinstein's Evidence, p 901(b)(4), at 901-49 (1990).
 
 
 13
 922 F.2d at 957. See also United States v. Newton, 891 F.2d 944, 947 (1st Cir.1989) (concluding that a document which contained statements "from which it could be inferred that [the defendant] authored the document" was properly authenticated). In the present case, Cronin expressed the opinion that the card was written by Jones because the card was signed "Kathie Jones" and because the card contained references to Cronin's daughter-in-law and granddaughter that no one else could have written. J.A. at 160-61. In light of this testimony, we conclude that the district court did not abuse its discretion by finding that the card allegedly written by Jones to Cronin met the authentication requirements in Rule 901.[1]
 
 III. ADMISSIBILITY OF EXPERT TESTIMONY
 A. Standard of Review
 
 14
 Appellant contends the district court erred by allowing into evidence testimony from the government's expert witness, Grant Sperry, a forensic document analyst. She argues that because handwriting analysis has never been validated as credible scientific or technical knowledge, the district court abused its discretion in determining that the evidence was sufficiently reliable. In particular, she states, "[c]learly Mr. Sperry is not an 'expert' in handwriting analysis, and this type of 'analysis' is not a credible scientific or technical knowledge." Appellant's Br. at 21.
 
 
 15
 Federal Rule of Evidence 702 provides the requirements for admissibility of expert testimony:
 
 
 16
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 17
 This circuit has traditionally reviewed a district court's ruling regarding the admissibility of expert testimony under Rule 702 for abuse of discretion. See, e.g., American & Foreign Ins. Co. v. General Elec. Co., 45 F.3d 135, 137, 139 (6th Cir.1995); United States v. Bonds, 12 F.3d 540, 554 (6th Cir.1993); United States v. Montgomery, 980 F.2d 388, 391 (6th Cir.1992); United States v. Pearce, 912 F.2d 159, 163 (6th Cir.1990), cert. denied, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991); McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1271 (6th Cir.1988); Hanson v. Parkside Surgery Ctr., 872 F.2d 745, 750 (6th Cir.), cert. denied, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989); Mannino v. International Mfg. Co., 650 F.2d 846, 849 (6th Cir.1981); see also Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) ("[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous."). Both parties in this case assumed that the abuse-of-discretion standard applied.
 
 
 18
 In Cook v. American S.S. Co., 53 F.3d 733, 738 (6th Cir.1995), however, the court stated that this traditional standard was "an oversimplification" and "often incorrect." It continued:
 
 
 19
 Appellate review of trial court rulings on the admissibility of expert opinion testimony under Fed.R.Evid. 702, depending on the assignment of error, may involve as many as three separate standards of review. The trial court's preliminary factfinding under Rule 104(a) is reviewed for clear error. These facts include, but are not limited to, whether the witness's "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, are such as to qualify him or her to testify as an expert at all, and it may include a determination of the tests or experiments that the proffered expert conducted, if any. The court's determination whether the opinion the expert wishes to offer is properly the subject of "scientific, technical, or other specialized knowledge" is a question of law we review de novo. An example of that sort of legal determination by the trial court is detailed in the Supreme Court's opinion in Daubert, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, in which the Court explained that part of a trial court's "gatekeeping" function under rule 702 when, for example, scientific opinion testimony is offered, is the determination whether "the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592-93, 113 S.Ct. at 2796. A comparable duty is imposed upon the trial court when the subject of the proposed opinion testimony is not "scientific" knowledge, but "technical, or other specialized knowledge." Finally, the trial court's determination whether the proffered expert opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702, is a relevancy determination and therefore one we review for abuse of discretion.
 
 
 20
 Id.
 
 
 21
 Aside from the merits of this novel three-part standard of review, we have serious concerns that the court in Cook created a conflict in this circuit on the proper standard for appellate review of district court decisions regarding the admissibility of expert testimony under Rule 702.[2] It is unclear to us on what the court in Cook based its conclusion that we are to apply a three-part standard of review, because the court cited no authority for this standard. Indeed, we have found no cases in other circuits or cases prior to Cook in this circuit that relied on such an approach. It appears to us that the abuse-of-discretion standard, which had been continually employed in this circuit prior to Cook, should have been binding on the court in Cook. See United States v. Edge, 989 F.2d 871, 876 (6th Cir.1993) ("[A] panel [of the Sixth Circuit] cannot overrule another panel's published decision on the same issue...."). However, to the extent that the court in Cook was correct that the abuse-of-discretion standard is "incomplete" and "often incorrect" then these cases potentially can be reconciled. We now attempt that task.
 
 
 22
 Our most serious concern with Cook is the court's statement, without citation, that de novo review applies to a "[district] court's determination whether the opinion the expert wishes to offer is properly the subject of 'scientific, technical, or other specialized knowledge[.]' " 53 F.3d at 738. While the court does provide an example from Daubert of this type of legal determination, there is, unfortunately, nothing in Daubert indicating that the Supreme Court was changing or articulating the standard of review, much less that it was classifying a district court's determinations on whether proffered testimony is the subject of "scientific, technical, or other specialized knowledge" as a "legal determination." In Daubert, the Court explicitly stated, "the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592, 113 S.Ct. at 2796 (footnote omitted). Under the Cook court's own reasoning, because Daubert shows that the determination whether proffered expert testimony consists of "scientific knowledge" is a preliminary determination made by the district court under Rule 104(a),[3] it should be given deference, not de novo review.
 
 
 23
 The de novo standard articulated in Cook is also questionable in light of American & Foreign Ins. Co. v. General Elec. Co., 45 F.3d 135 (6th Cir.1995), and United States v. Bonds, 12 F.3d 540 (6th Cir.1993). In American & Foreign Ins. Co., decided two years after Daubert and just three months before Cook, the court, similar to the Cook court, analyzed Daubert 's impact on the reliability of expert testimony under Rule 702. Unlike Cook, however, the court in American & Foreign Ins. Co. articulated the standard of review of a district court's decision to admit or exclude expert testimony under Rule 702 as follows: "A trial court 'has broad discretion in the matter of the admission or exclusion of expert evidence, and [the court's] action is to be sustained unless manifestly erroneous.' " Id. at 137 (quoting Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)) (alteration in American & Foreign Ins. Co.). In Bonds, a case involving the reliability of DNA evidence under Rule 702, the defendant-appellant asked the court of appeals to consider a report by the National Research Committee of the National Academy of Sciences that questioned the FBI's method of declaring DNA matches. The report was issued almost two years after the admissibility hearing before the magistrate judge and was not considered at the trial level. The court refused to consider the report for purposes of the appeal:
 
 
 24
 [I]f we were to look at new scientific data available to us but not available to the district court that made the admissibility determination, we would not be confining ourselves to reviewing the district court's admissibility ruling, but would be making a de novo determination based on post-conviction developments or articles. This is not the function of an appellate court.
 
 
 25
 Id. at 553 (emphasis in original). The court then stated that the district court's decision to admit the DNA evidence under Rule 702 is reviewed for abuse of discretion. Id. at 554. Finding no abuse, the court concluded that the DNA evidence was properly admitted under Rule 702. Id. at 566.
 
 
 26
 Most of our sister circuits also have applied the traditional abuse-of-discretion review in post-Daubert cases involving Rule 702. See Lust v. Merrell Dow Pharm., Inc., 89 F.3d 594, 597-98 (9th Cir.1996) (stating that the district court did not abuse its discretion in concluding that, under Daubert, the methodology underlying the proffered expert witness's testimony was not scientific)[4]; McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir.1995) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous."); Government of Virgin Islands v. Sanes, 57 F.3d 338, 341 (3d Cir.1995) ("Whether to allow scientific or technical expert testimony ... is within the discretion of the district court and is reviewed only for abuse."); Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1384 (4th Cir.1995) ("Daubert clearly vests the district courts with discretion to determine the admissibility of expert testimony."); Pedraza v. Jones, 71 F.3d 194, 197 (5th Cir.1995) (stating that "the district court did not abuse its discretion" in concluding that the proffered expert testimony did not satisfy Daubert 's reliability requirements)[5]; Pestel v. Vermeer Mfg. Co., 64 F.3d 382, 384-85 (8th Cir.1995) ("The [District] Court concluded that the testimony was not scientifically valid and would not aid the jury in its fact finding. We do not find that the District Court abused its discretion in any of its analysis."); see also United States v. Hall, 93 F.3d 1337, 1342 (7th Cir.1996) (stating that, in reviewing determinations regarding the admissibility of scientific evidence, the court reviews de novo whether the district court "properly followed" the Daubert framework, and if the district court did so, its findings will only be overturned if they were clearly erroneous); cf. 1 STEVEN ALAN CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW, § 4.02, at n. 12 (2d ed. Supp.1996) ("Daubert is not the clearest of opinions as to how the admissibility decision is made, but at least it is apparent that most of the decisionmaking is located in the trial judge, which is consistent with ... abuse of discretion review."); G. Michael Fenner, The Daubert Handbook: The Case, Its Essential Dilemma, and Its Progeny, 29 CREIGHTON L.REV. 939, 1028 (1996) ("[T]he standard of review of Daubert testing on appeal is pretty clear. Though the words vary, the meaning is the same: almost all of the cases say the standard is broad or deferential, it is a clearly erroneous standard, it looks for manifest or clear abuse of discretion."); Gordon J. Beggs, Novel Expert Evidence in Federal Civil Rights Litigation, 45 AM.U.L.REV. 1, 37 (1995) ("A district court has wide discretion in determining whether to admit or exclude evidence, particularly expert testimony. An appellate court will generally accord wide latitude in the proper exercise of discretion under Daubert and will reverse its findings only if they are manifestly erroneous or an abuse of discretion.") (footnotes omitted).
 
 
 27
 To the extent the court in Cook was concerned that application of the abuse-of-discretion standard is "often incorrect" because it renders it more difficult for an appellate court to review legal determinations made by district courts during the course of evidentiary hearings, this concern is unwarranted. If a district court incorrectly decides a legal issue during the course of a hearing on the admissibility of expert testimony, then that court has abused its discretion. See Koon v. United States, --- U.S. ----, ----, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402, 110 S.Ct. 2447, 2459, 110 L.Ed.2d 359 (1990) ("An appellate court would be justified in concluding that, in making [legal] errors, the district court abused its discretion." ).[6]
 
 
 28
 Apart from the concerns we have regarding the novel de novo standard articulated in Cook, the court additionally complicated the analysis by creating separate standards for reviewing a district court's determinations regarding the qualifications of a particular expert and whether the proffered testimony would be helpful to the jury. The court stated that the former were reviewed for "clear error" and the latter for "abuse of discretion." Cook, 53 F.3d at 738. In light of statements from both the Supreme Court and the Sixth Circuit, however, these two standards appear to represent a difference without a distinction. See Cooter & Gell, 496 U.S. at 401, 110 S.Ct. at 2458 ("When an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: A court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous."); American & Foreign Ins. Co., 45 F.3d at 139 ("[The] 'district court abuses its discretion only when it relies on clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard.' ") (quoting Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 30 (6th Cir.1988)).
 
 
 29
 Although there is little precedential support for Cook 's three-part standard, the de novo prong has some intuitive appeal to it, at least when it is applied in a limited way.[7] A de novo standard is particularly appealing with respect to the validity of various types of scientific evidence. See David L. Faigman et al., Check Your Crystal Ball at the Courthouse Door, Please: Exploring the Past, Understanding the Present, and Worrying About the Future of Scientific Evidence, 15 CARDOZO L.REV. 1799, 1821 (1994) ("Trial courts are no better situated [than appellate courts] to assess the validity of scientific methods. Such determinations do not, for instance, depend on assessing the credibility of witnesses or knowledge of local conditions. Indeed, judicial assessment of validity might be better conducted through written briefs rather than oral testimony."). A de novo standard also ensures that there are not conflicting pronouncements in a circuit regarding the validity of scientific methods. But if a de novo standard is to be applied, the distinction between general scientific principles and how those principles are applied in a particular dispute should be recognized. See id. ("Scientific methods ordinarily operate at two fact levels of the trial process. Scientific information both transcends individual disputes and is specific to particular disputes. The de novo standard should apply to scientific information that transcends a particular dispute.") (footnotes omitted); see also Edward J. Imwinkelried, The 'Bases' of Expert Testimony: The Syllogistic Structure of Scientific Testimony, 67 N.C. L. REV. 1, 1-8 (1988) (stating that while most expert scientific testimony is presented in a syllogistic format, with general scientific principles representing the expert witness's major premise and facts to which those principles are applied representing the minor premise, most courts do not recognize the distinction).
 
 
 30
 The de novo standard articulated in Cook loses some of its appeal when the expert testimony at issue is not scientific, but rather is based upon "technical, or other specialized knowledge." Because the general reliability of non-scientific expert testimony does not always neatly separate itself from whether the particular expert in the case is qualified and whether the testimony will be helpful to the trier of fact, application of a de novo standard to this particular prong could be difficult. Even though a subject matter in general might be a proper subject for expert testimony (e.g., testimony from an economist regarding the relevant market in an antitrust case), a layperson attempting to give expert testimony in this field, in addition to being unqualified as an expert, would not be rendering testimony based on "scientific, technical, or other specialized knowledge"; nor would this testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."[8] That a non-scientific expert's experience and training bear a strong correlation to the reliability of the expert's testimony is nicely illustrated by Professor Imwinkelried, who stated:
 
 
 31
 When Justice Blackmun addressed the epistemological question in Daubert and endeavored to identify the process by which we come to know the truth of scientific propositions, the answer was validation by the experimental technique of Newtonian science. Experience is to nonscientific experts as experimentation is to scientists. Perhaps more than any other area of Evidence law, nonscientific expert testimony bears out Locke's position that 'all our knowledge is founded in experience....' Nonscientific experts are 'experientially qualified.' Their experience largely is their expertise.
 
 
 32
 Edward J. Imwinkelried, The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony, 15 C ARDOZO L. R EV. 2271, 2289 (1994) (citations and footnotes omitted) (alteration in original). Although experience alone does not ensure either reliability or admissibility, it plays enough of a role in the reliability analysis in the context of non-scientific experts to blur the distinctions between the three separate prongs in Cook.
 
 
 33
 In the end, we must apply some standard to evaluate the district court's evidentiary decision in this case. One possible approach would be to conclude that a direct conflict between Cook and the prior precedent in this circuit exists and to follow the prior precedent. See Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 781 (3d Cir.1990) (stating that, because a panel is bound by prior panel precedent, to the extent that a conflict exists, the earlier case will control).[9] We decline to take this draconian measure, however, because it is simply unnecessary in this case. Below we conclude that handwriting analysis is a proper field of expertise under Rule 702 and that Sperry's testimony in this case was otherwise sufficiently reliable. Our conclusion with respect to handwriting analysis constituting a field of expertise is the same whether we apply de novo or abuse-of-discretion review. In light of this fact, we leave to future panels--perhaps those facing issues in which application of one standard of review over another is outcome determinative--the task of resolving the precise contours of the de novo standard, if such a standard exists. As for the reliability of Sperry's case-specific testimony, we review appellant's challenges to the admission of this testimony under the traditional abuse-of-discretion standard.
 
 B. The Daubert
 Decision
 
 34
 In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court clarified the admissibility requirements for expert scientific testimony by holding that Rule 702 supersedes Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), which required that expert scientific testimony had to be "generally accepted" to be admissible. According to the Court, "a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.' " 509 U.S. at 588, 113 S.Ct. at 2794 (citation omitted). Even with the relaxed standard in Rule 702 governing expert scientific testimony, however, the Court stated that the trial judge would still serve an important gatekeeping role: "[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589, 113 S.Ct. at 2794. The Court then suggested a "flexible" list of factors for a district court to consider when presented with scientific testimony to determine whether the reliability component has been met: (1) "whether a theory or technique ... can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "general acceptance." Id. at 593-94, 113 S.Ct. at 2796-97. While the Court stated that its discussion was "limited to the scientific context," as opposed to "technical, or other specialized knowledge," id. at 590 n. 8, 113 S.Ct. at 2795 n. 8, the dissent suggested that the Court left open this question. Id. at 600, 113 S.Ct. at 2800 (Rehnquist, C.J., concurring in part and dissenting in part).
 
 
 35
 In analyzing Daubert, we have stated that "although 'Daubert dealt with scientific experts, its language relative to the 'gatekeeper' function of federal judges is applicable to all expert testimony offered under Rule 702.' " United States v. Thomas, 74 F.3d 676, 681 (6th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996) (quoting Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir.1994), cert. denied, 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995)). It is thus clear that a district court has the duty to decide not only whether evidence is relevant but also whether it is reliable. See id. But this conclusion does not come from the Daubert opinion itself; rather, it comes from the Federal Rules of Evidence:
 
 
 36
 That these requirements [of relevance and reliability] are embodied in Rule 702 is not surprising. Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation. See Rules 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge--a rule which represents "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information,' " Advisory Committee's Notes on Fed. Rule Evid. 602, 28 U.S.C.App., p. 755 (citation omitted)--is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.
 
 
 37
 Daubert, 509 U.S. at 592, 113 S.Ct. at 2796. With the gatekeeping requirements imposed on district courts and the discussion in Daubert regarding scientific evidence in mind, we now address Daubert 's application to the present dispute.C. Handwriting Analysis as Scientific Evidence
 
 
 38
 Appellant first argues that this case falls squarely within Daubert 's framework because handwriting analysis is purportedly "scientific" testimony. Even with this argument, however, appellant herself admits that "handwriting analysis was never scrutinized under Daubert 's predecessor, Frye v. United States ...." Appellant's Br. at 18. She is, therefore, arguing that even though expert handwriting analysis was never considered a matter of scientific knowledge by any of the courts applying the Frye test over a seventy-year period, we should treat it as such now and conclude that it fails the Daubert reliability requirements. We decline her invitation to do so.
 
 
 39
 In Daubert, the court stated: "The adjective 'scientific' implies a grounding in the methods and procedures of science.... '[Science] represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement.' " 509 U.S. at 590, 113 S.Ct. at 2795 (citation omitted) (emphasis in original). The court continued: " 'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.' ... '[T]he statements constituting a scientific explanation must be capable of empirical test.' " Id. at 593, 113 S.Ct. at 2796 (citations omitted). We are quite convinced that handwriting examiners do not concentrate on "proposing and refining theoretical explanations about the world," Daubert, 509 U.S. at 590, 113 S.Ct. at 2795, but instead use their knowledge and experience to answer the extremely practical question of whether a signature is genuine or forged. See United States v. Starzecpyzel, 880 F.Supp. 1027, 1041 (S.D.N.Y.1995) ("[W]hile scientific principles may relate to aspects of handwriting analysis, they have little or nothing to do with the day-to-day tasks performed by [forensic document examiners].") (emphasis in original).
 
 
 40
 Moreover, academicians and forensic document examiners alike have recognized the lack of empirical evidence in the field of handwriting analysis. See, e.g., 2 PAUL C. GIANNELLI & EDWARD J. IMWINKELRIED, SCIENTIFIC EVIDENCE §§ 21-2(B), at 152 (2d ed. 1993) ("[T]he [document] examiner cannot quantify the probability of a match with any degree of precision. Determining a probability would require data as to the frequency with which stylistic details recur. That data is currently unavailable."); Paul C. Giannelli, The Admissibility of Laboratory Reports in Criminal Trials: The Reliability of Scientific Proof, 49 OHIO ST. L.J. 671, 691 n.166 (1988) ("[I]dentification evidence is based either on 'the general experience of the criminalists or more exacting statistical studies.' Fingerprint, firearms identification, and handwriting comparisons fall into the former category. Because they are not statistically-based, they 'are necessarily somewhat subjective ....' ") (citations omitted); Mosh Kam et al., Proficiency of Professional Document Examiners in Writer Identification, 39 JOURNAL OF FORENSIC SCI. 5, 7 (1994) (stating that there is a "lamentable lack of empirical evidence" about forensic document analysis); Roy A. Huber & A.M. Headrick, Let's Do It By Numbers, 46 FORENSIC SCI. INT'L 209, 213 (1990) ("We are ... compelled to recognize the assignment of numbers to represent facts as a necessary ingredient of most, if not all, disciplines of science.... Until we [assign numbers in our analysis of handwriting] we must accept the fact [that] this area of our work does not meet the criteria for science.") See also Bryan Found and Doug Rogers, Contemporary Issues in Forensic Handwriting Examination. A Discussion of Key Issues in the Wake of the Starzecpyzel Decision, 8 JOURNAL OF FORENSIC DOCUMENT EXAMINATION 1, 26 (1995) ("That the expertise of document examiners is properly characterized as 'practical in character' rather than scientific, we do not consider to be inaccurate or inappropriate.") (citation omitted). We will thus analyze appellant's objections to the expert handwriting analysis in this case under the "technical, or other specialized knowledge" component of Rule 702.[10] This conclusion, however, does not answer the question whether Daubert extends beyond scientific knowledge.
 
 D. Daubert 's
 
 41
 Application to Non-Scientific Expert Testimony
 
 
 42
 Appellant argues that the factors outlined in Daubert dealing with the admissibility of scientific evidence apply equally here, even though handwriting analysis, at least at the present time, is not a scientific field. She is thus asking us not only to rely on the "gatekeeping" discussion in Daubert but also to apply the other Daubert principles to "technical, or other specialized knowledge" as well. In Berry v. City of Detroit, we stated:
 
 
 43
 The distinction between scientific and non-scientific expert testimony is a critical one. By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
 
 
 44
 On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.
 
 
 45
 25 F.3d 1342, 1349-50 (6th Cir.1994), cert. denied, 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995) (emphasis in original).
 
 
 46
 As we implicitly recognized in Berry, Daubert does not create a new framework for analyzing proffered expert testimony based upon "technical, or other specialized knowledge." Daubert provides a "flexible" framework to aid district courts in determining whether expert scientific testimony is reliable. If that framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony--that derived substantially from practical experience--would be excluded. Such a result truly would turn Daubert, a case intended to relax the admissibility requirements for expert scientific evidence, on its head. Many of our sister circuits have given a similar reading to Daubert. See United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir.1996) (stating that, aside from overruling Frye and articulating the standards for determining the reliability of scientific expert evidence, Daubert "did not otherwise work a sea change over federal evidence law"); United States v. Sinclair, 74 F.3d 753, 757 (7th Cir.1996) ("Daubert does not create a special analysis for answering questions about the admissibility of all expert testimony. Instead, it provides a method for evaluating the reliability of witnesses who claim scientific expertise."); Iacobelli Constr., Inc. v. County of Monroe, 32 F.3d 19, 25 (2d Cir.1994) ("[The district court's] reliance on Daubert was misplaced. Daubert sought to clarify the standard for evaluating 'scientific knowledge' for purposes of admission under Fed.R.Evid. 702."); see also Edward J. Imwinkelried, The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony, 15 C ARDOZO L. R EV. 2271, 2283 (1994) ("Neither the essential test enunciated in Daubert, nor the factors listed by the Court are applicable to nonscientific opinion. The Daubert test is grounded in the scientific process and directs the judge to evaluate the quality of the testing supporting the scientific conclusion.") (footnotes omitted). Without relying on Daubert, we now address whether handwriting analysis constitutes "technical, or other specialized knowledge" under the Federal Rules of Evidence and whether the expert handwriting analysis offered in this case was sufficiently reliable.
 
 
 47
 E. Handwriting Analysis as Non-Scientific Expert Testimony
 
 
 48
 Appellant's first--and principal--argument is that expert handwriting analysis is not a field of expertise under Rule 702. She is, therefore, asking us to do what no other court that we have found has done--hold that expert handwriting analysis is inadmissible under the Federal Rules of Evidence. The district court overruled appellant's motion in limine on this issue. J.A. at 79-80. While few courts have directly confronted the issue whether expert handwriting analysis is inadmissible under the Rules (perhaps because there have been few frontal assaults to this type of testimony as a whole), the courts that have considered the issue have recognized handwriting analysis as a field of expertise. See United States v. Velasquez, 64 F.3d 844, 851 (3d Cir.1995) ("We agree with the district court that [the] proposed testimony [with respect to handwriting analysis] concerned 'scientific, technical or other specialized knowledge' and was sufficiently reliable to be admissible."); United States v. Starzecpyzel, 880 F.Supp. 1027, 1047 (S.D.N.Y.1995) ("The Court therefore finds sufficient indicia of reliability to sustain the admissibility of [forensic document examiner] expertise as nonscientific expert testimony."); Greenberg Gallery, Inc. v. Bauman, 817 F.Supp. 167, 172 n. 5 (D.D.C.1993) ("It can be judicially noted that handwriting, like fingerprints, are subject to established objective tests, expert opinions about which are admissible."), aff'd, No. 93-7068, 1994 WL 525814 (D.C.Cir. Sept.21, 1994); cf. 2 PAUL C. GIANNELLI & EDWARD J. IMWINKELRIED, SCIENTIFIC EVIDENCE §§ 21-2(B), at 150 (2d ed. 1993) ("A single handwriting specimen may contain between 500 and 1,000 details, and most of the details are inconspicuous to the untrained eye.") (footnote omitted).
 
 
 49
 In addition, the Federal Rules of Evidence themselves suggest that handwriting analysis is a field of expertise. Although the text of Rule 702 does not mention any specific fields of expertise, the advisory committee notes to that Rule indicate that a wide array of expert testimony is contemplated by the Rule:
 
 
 50
 The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training, or education." Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.
 
 
 51
 Fed.R.Evid. 702 advisory committee's note. As the discussion below indicates, Sperry's expertise is largely a product of his "knowledge, skill, experience, training, [and] education." Moreover, Federal Rule of Evidence 901(b)(3) provides for authentication of a document by "[c]omparison by ... expert witnesses with specimens which have been authenticated."[11] Although authentication under Rule 901 does not ensure admissibility, see 5 JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE p 901(a), at 901-28 (1996) ("A document is not admissible simply because it has been authenticated. For example, if offered to prove the truth of assertions made in it, the document will need to meet hearsay requirements.") (footnote omitted), if we were to hold that handwriting analysis is not a field of expertise under the Federal Rules of Evidence, there would be no place for expert witnesses to compare writing on one document with that on another in order to authenticate a document. In other words, appellant's suggested approach would render Rule 901(b)(3) meaningless. We refuse to adopt that interpretive approach. See Lake Cumberland Trust, Inc. v. U.S. EPA, 954 F.2d 1218, 1222 (6th Cir.1992) ("[W]e must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."). In short, expert handwriting analysis is a field of expertise under the Federal Rules of Evidence.[12] This decision, however, does not guarantee the reliability or admissibility of this type of testimony in a particular case. Because this is non-scientific expert testimony, its reliability largely depends on the facts of each case.
 
 
 52
 The facts in this case provide an ideal illustration as to why an expert's qualifications and the reliability of his testimony do not always separate into a clear dichotomy. Sperry is employed by the United States Postal Inspection Service Forensic Laboratory in Memphis as a forensic document analyst. To train for his job, he completed a two year in-residence course in questioned documents with the United States Army Criminal Investigation Laboratory, completed both the FBI and U.S. Secret Service courses in questioned documents, and received additional training at the CIA training laboratory, the Bureau of Printing and Engraving, the Rochester Institute of Technology, the Royal Canadian Mounted Police Laboratory, the Georgia Bureau of Investigation Laboratory, and the Immigration and Naturalization Service headquarters. Trial Tr. at 121-22. His primary job responsibilities consist of "the examination and comparison of questioned handwriting and known handwriting and machine produced documents for the purpose of identifying or eliminating a particular person or machine as the source of that question or product[,] whether it be writing or machine product entries." J.A. at 153. He estimated that, throughout his employment, he had conducted "well over a million comparative examinations." J.A. at 154. In addition, he has published numerous articles in the field and testified approximately 240 times in various courts. J.A. at 155. To put it bluntly, the federal government pays him to analyze documents, the precise task he was called upon to do in the district court. See Imwinkelried, 15 CARDOZO L.REV. at 2292-93 (stating that the reliability of non-scientific expert testimony increases with the more experiences an expert has had and the similarity of those experiences to the expert's testimony). Indeed, handwriting examiners themselves have recognized the importance of experience:
 
 
 53
 As with any opinion expressed on the outcome of human movements, there is a fundamental requirement to be familiar with the normal range and variation of movement outcomes in the population from which routine examination material is drawn. For handwriting examiners, this experience comes mainly from the exposure we have to handwriting throughout the course of our life, the majority of which normally would occur before specializing in forensic handwriting examination. Forensic training serves to focus our approach to the comparison process according to the method. It should not be seen to be isolated from the real basis on which our opinions are formed which is a general exposure to the population of writing images, coupled with a knowledge of the limitations of the technique and the relationship between neural representations, artifacts of movement, complexity of images, and what can reasonably be said regarding authorship of entries based on these elements.
 
 
 54
 Found & Rogers, 8 JOURNAL OF FORENSIC DOCUMENT EXAMINATION at 26.
 
 
 55
 As for Sperry's specific testimony in this case, he outlined the procedure that he uses when comparing a questioned signature with a known one. J.A. at 141-142. He then focused on enlargements of the signatures at issue in this case and described to the jury, in some detail, how he reached his ultimate conclusions. Trial Tr. at 147-160. His testimony enabled the jury to observe firsthand the parts of the various signatures on which he focused. See Starzecpyzel, 880 F.Supp. at 1044 (" '[T]he ability of jurors to perform the crucial visual comparisons relied upon by handwriting experts cuts against the danger of undue prejudice from the mystique attached to "experts" ' ") (citation omitted).
 
 
 56
 Given Sperry's various training experiences, his job responsibilities, his years of practical experience, and the detailed nature of his testimony in this case, we hold that the district court did not abuse its discretion by admitting his testimony. But we wish to emphasize that just because the threshold for admissibility under Rule 702 has been crossed, a party is not prevented from challenging the reliability of the admitted evidence. See Daubert, 509 U.S. at 596, 113 S.Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); United States v. Velasquez, 64 F.3d 844, 852 (3d Cir.1995) (concluding that the district court erred by refusing to allow defendant's expert document examiner to testify in response to the government's document examiner). In this case, however, appellant does not contend that the district court prevented her from challenging the reliability of Sperry's testimony. Simply put, no abuse of discretion occurred.
 
 
 57
 IV. JONES'S CRIMINAL HISTORY CATEGORY UNDER U.S.S.G. § 4A1.1
 
 
 58
 Jones argues that the district court erred by enhancing her sentence based on a prior sentence that she served in the Community Alternatives to Prison Program ("CAPP"), a program under Tennessee law that allowed Jones to receive home detention in lieu of prison time. The district court assigned three criminal history points for this sentence pursuant to U.S.S.G. § 4A1.1(a), because, in the district court's view, her time spent in home detention constituted a sentence of imprisonment. J.A. at 172-73. Because Jones received a total of thirteen criminal history points, her criminal history category was VI. J.A. at 54. This criminal history category coupled with her offense level of nine produced a guidelines range of twenty-one to twenty-seven months of imprisonment. See U.S.S.G. Ch. 5, Pt. A. The district court in this case sentenced Jones to the maximum twenty-seven months. J.A. at 39. If the three criminal history points for Jones's previous sentence of home detention were assigned in error, Jones would have received only one point for the CAPP term under § 4A1.1(c), which directs the court to add one point for "each prior sentence not counted in [§ 4A1.1(a) and (b) ]." If only one point had been assigned for her CAPP term, her criminal history points would have totaled eleven, which would have placed her in criminal history category V, which in turn would have produced a sentencing range of eighteen to twenty-four months of imprisonment. We review a district court's interpretation of a provision of the Guidelines de novo. United States v. Barton, 100 F.3d 43, 44 (6th Cir.1996); United States v. Sanders, 95 F.3d 449, 454 (6th Cir.1996); United States v. Rasco, 963 F.2d 132, 134 (6th Cir.), cert. denied, 506 U.S. 883, 113 S.Ct. 238, 121 L.Ed.2d 173 (1992).[13]
 
 
 59
 The issue we decide is whether the sentence Jones served in home detention constitutes "a sentence of imprisonment" under U.S.S.G. § 4A1.1(a). Section 4A1.2(b)(1) defines "sentence of imprisonment" as a "sentence of incarceration." One of the application notes to this section states that "[t]o qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence...." U.S.S.G. § 4A1.2 commentary, applic. note 2. The Guidelines, however, do not further define "sentence of imprisonment," nor do they explicitly indicate whether time spent in home detention constitutes such a sentence under § 4A1.1(a).[14]
 
 
 60
 The government's primary argument is that our resolution of this issue is controlled by our decision in United States v. Rasco, in which "we address[ed] the narrow issue of whether detention in a halfway house or community treatment center upon revocation of a defendant's parole constitutes a sentence of incarceration within the meaning of section 4A1.2(e)(1) of the federal sentencing guidelines." 963 F.2d at 133. In Rasco, the defendant had previously served a sentence in a halfway house because of a parole violation. Under § 4A1.2(k)(1), any term of imprisonment imposed upon revocation of parole is to be added to any term of imprisonment already imposed for that underlying offense for purposes of computing criminal history points. In analyzing whether time served in a halfway house upon the revocation of parole is a "sentence of imprisonment" the court decided not to focus "exclusively on the place of the defendant's detention," but to adopt a "functional approach" that "focuses on the reason for the defendant's detention." Id. at 135 (emphasis in original). The court explained:
 
 
 61
 Were we to focus solely on the place of detention, [§ 4A1.2(k) ] would offer no more guidance than the other provisions of Chapter Four, because it likewise fails to address whether detention in a halfway house upon parole revocation is a "term of imprisonment." We believe, however, that section 4A1.2(k) expresses the Commission's view that a sentence imposed upon revocation of parole, regardless of whether the sentence is served in prison, a halfway house, or a community treatment center, be added to the original term of imprisonment, requiring the sentencing court to count them as a single sentence for purposes of criminal history scoring.... Given the many forms that a parole revocation sentence may take, we are confident that the purpose of this section is best served by requiring the sentencing court to focus upon the fact that the sentence was imposed because of the defendant's violation of his parole, rather than on the place where the sentence was served.
 
 Id. at 135-36. It then recognized that:
 
 62
 [T]his interpretation arguably conflicts with the background commentary to section 4A1.1. Section 4A1.1 distinguishes between sentences of imprisonment exceeding one year and one month (subsection (a)), sentences of imprisonment of at least sixty days (subsection (b)), and all other sentences (subsection (c)). The background commentary explains that "[s]ubdivisions (a), (b), and (c) of § 4A1.1 distinguish confinement sentences longer than one year and one month, shorter confinement sentences of at least sixty days, and all other sentences, such as confinement sentences of less than sixty days, probation, fines, and residency in a halfway house." U.S.S.G. § 4A1.1, comment. (backg'd). This commentary seems to equate confinement sentences with sentences of imprisonment and distinguish both from residency in a halfway house. We do not read this commentary, however, as categorically excluding detention in a halfway house from the definition of a "sentence of incarceration" for purposes of computing the applicable time period under section 4A1.2(e), nor do we read it as excluding halfway house placement from the definition of a "sentence of imprisonment" under section 4A1.2(k). Such an interpretation would elevate the importance of a defendant's place of detention over the reason for which the detention was imposed, thereby frustrating the position of section 4A1.2(k), that a sentence imposed upon revocation of parole be added to the original sentence regardless of where the sentence is served. To the extent that the commentary to section 4A1.1 conflicts with the mandates of section 4A1.2(k), we conclude that section 4A1.2(k) controls.
 
 
 63
 Id. at 136-37.
 
 
 64
 Appellee argues that, according to Rasco, we should focus on the reason for Jones's participation in CAPP, rather than on the conditions imposed by her sentence. According to the government, Jones was placed in CAPP because of Tennessee's policy of attempting "to reserve 'secure confinement facilities for violent felony offenders.' " Appellee's Br. at 28 (quoting T.C.A. § 40-36-103(1)). Appellee goes on to argue that the State of Tennessee treated the time Jones spent in home detention as a "sentence of imprisonment." The government is thus apparently asking us to rely on state law in our interpretation of the United States Sentencing Guidelines. Rasco does not stand for such a proposition, and we decline the government's request to apply it in that way. Rasco 's focus on the reason why the sentence at issue in that case was imposed--a violation of parole--not only is consistent with that court's interpretation of § 4A1.2(k), but also does not force a federal court interpreting the Guidelines to ascertain how various states define a "sentence of imprisonment."[15]
 
 
 65
 To extend Rasco to stand for the proposition that we turn to state law to define terms in the Sentencing Guidelines would be a clear misapplication of the law. See Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 119, 103 S.Ct. 986, 995, 74 L.Ed.2d 845 (1983) (" "[I]n the absence of a plain indication to the contrary, ... it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law." ") (quoting NLRB v. Natural Gas Util. Dist., 402 U.S. 600, 603, 91 S.Ct. 1746, 1748, 29 L.Ed.2d 206 (1971), in turn quoting NLRB v. Randolph Elec. Membership Corp., 343 F.2d 60, 62-63 (4th Cir.1965)). Indeed, we have explicitly applied the Supreme Court's pronouncements in Dickerson to federal sentencing issues. See United States v. Kirby, 893 F.2d 867, 868 (6th Cir.1990) ("Federal law, not Kentucky law, controls sentencing disposition in the event of convictions for federal offenses.") (citing Dickerson, 460 U.S. at 111-12, 103 S.Ct. at 991-92; Flippins v. United States, 808 F.2d 16, 19 (6th Cir.1987)).
 
 
 66
 Additionally, the adoption of appellee's argument would contravene one of the very purposes of the sentencing guidelines--uniformity. See U.S.S.G. Ch. 1, Pt. A. ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders."). As the Seventh Circuit stated in United States v. Phipps, 68 F.3d 159 (7th Cir.1995):
 
 
 67
 [Looking to state law to define terms in the Sentencing Guidelines] would lead to divergent aggregate sanctions depending on which state the crime occurred in, undermining the most basic purpose of the Sentencing Reform Act of 1984 and the Guidelines themselves. The meaning of "imprisonment" therefore is a question of federal law, one depending on what states do rather than on the labels they attach to their sanctions.
 
 
 68
 Id. at 161 (emphasis in original). See also United States v. Stewart, 49 F.3d 121, 123 n. 3 (4th Cir.1995) ("A federal court construing the federal Sentencing Guidelines need not turn to state law. Rather we should try to ascertain a sound interpretation of the Guidelines and its goals."). We therefore turn to the Sentencing Guidelines themselves to determine whether home detention constitutes a "sentence of imprisonment" under § 4A1.1.[16]
 
 
 69
 As an initial matter, we note that this is an entirely different issue than that faced by the court in Rasco. As the lengthy quotation above from Rasco indicates, the court in that case made it clear that its decision rested on its interpretation of § 4A1.2(k), namely that "a sentence imposed upon a revocation of parole be added to the original sentence regardless of where that sentence is served." 963 F.2d at 137. Because of its interpretation of § 4A1.2(k), it did not rely on background commentary in a different section, which it found to be at odds with § 4A1.2(k). In the present dispute, however, we are not called upon to interpret § 4A1.2(k), but instead we must interpret the very section to which the conflicting background commentary discussed in Rasco applies. Moreover, unlike the court in Rasco, we are focusing on the Guidelines' treatment of "home detention."[17]
 
 
 70
 Our starting point is § 4A1.1 itself. Subsections (a) and (b) distinguish between sentences of imprisonment exceeding one year and one month and sentences of imprisonment of at least sixty days that do not reach the thirteen-month threshold. Sentences falling in the former category are assigned three criminal history points and those in the latter two points. Subsection (c) does not mention "sentence of imprisonment" but instead states that the sentencing court is to add one point "for each prior sentence not counted in (a) or (b)...." Thus, the Guidelines explicitly recognize a distinction between a "sentence of imprisonment" and a "prior sentence." The background commentary to this section sheds light on this distinction: "Subdivisions (a), (b), and (c) of § 4A1.1 distinguish confinement sentences longer than one year and one month, shorter confinement sentences of at least sixty days, and all other sentences, such as confinement sentences of less than sixty days, probation, fines, and residency in a halfway house." U.S.S.G. § 4A1.1 commentary, background (emphasis added). While home detention is not mentioned in this commentary, we are confident that, given its uniform treatment throughout the Guidelines, as discussed below, it would be classified in the "all other sentences" category. Because there is no conflict between this background commentary and the section to which it applies, we are not faced with the conflict presented in Rasco, and we thus find this commentary highly useful in our analysis.
 
 
 71
 As we turn to other sections in the Guidelines, we recognize that "definitions [of terms in other sections of the Guidelines] are not designed for general applicability; therefore, their applicability to sections other than those expressly referenced must be determined on a case by case basis." U.S.S.G. § 1B1.1 commentary, applic. note 2. In our view, because home detention is not mentioned in the section at issue in this case, and because the other sections give a uniform treatment to the distinction between incarceration and home detention, this is an appropriate case for us to review the Guidelines' treatment of home detention in other sections. Because our mission in this case is to interpret the Sentencing Guidelines, were we unable to consult other sections of the Guidelines, we would be left to construct a definition on our own. It is unnecessary for us to do so in this case, however, because of the consistent treatment given to "home detention" throughout the Guidelines.
 
 
 72
 Other sections in the Guidelines explicitly recognize a distinction between incarceration and home detention. Section 5F1.2 provides that "[h]ome detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment." As we have stated before, "[t]his [section] makes clear that home detention is not equivalent to imprisonment for the purposes of initial incarceration." United States v. Harris, Nos. 91-2421 to 91-2423, 1992 WL 393582, at * 2 (6th Cir. Dec. 31, 1992). Additionally, § 7B1.3(d) states that when revocation of probation or supervised release is ordered, "any such unserved period of community confinement, home detention, or intermittent confinement may be converted to an equivalent period of imprisonment." If home detention under this section can be "converted" into a period of imprisonment, the two most definitely are not the same. Another relevant section is 5B1.4(b)(20), which recommends conditions of probation and supervised release. It provides: "Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment." Given the Sentencing Guidelines' uniform treatment of home detention, it is, therefore, apparent that under the Sentencing Guidelines, time spent in home detention does not constitute a "sentence of imprisonment." See United States v. Phipps, 68 F.3d 159, 162 (7th Cir.1995) (" 'Home detention' differs from 'imprisonment' throughout the Guidelines' schema. It is not 'imprisonment' but is a 'substitute for imprisonment.' ") (quoting U.S.S.G. § 5B1.4(b)(20)). In light of the fact that the Guidelines consistently recognize the distinction between home detention and imprisonment and in light of our reading of § 4A1.1 and its background commentary, we hold that the district court erred by treating Jones's time spent in home detention under CAPP as a "sentence of imprisonment" under § 4A1.1(a) of the Sentencing Guidelines.[18]
 
 V. CONCLUSION
 
 73
 We AFFIRM the district court's evidentiary rulings and therefore AFFIRM Jones's convictions. We REVERSE the district court's determination that the time Jones spent in home detention constituted a "sentence of imprisonment." Because the district court's error resulted in Jones being assigned incorrectly to a higher criminal history category, we VACATE her sentence and REMAND for further proceedings consistent with this opinion.
 
 
 74
 KRUPANSKY, Circuit Judge, concurring in part and dissenting in part.
 
 
 75
 I agree with the panel majority's conclusions that the district court did not abuse its discretion by finding that a card allegedly written by the defendant was authentic and hence admissible as a handwriting exemplar, and by admitting expert handwriting identification testimony from a forensic document examiner. Accordingly, I join parts I, II, and III of the majority opinion, and CONCUR in the affirmation of the defendant's June 1995 conviction.
 
 
 76
 However, the panel majority's conclusion that Jones's January 1994 Tennessee court sentence to four years' incarceration for forgery[1] did not constitute a "prior sentence of imprisonment" under U.S.S.G. § 4A1.1(a) because state authorities permitted Jones to serve that sentence in residential confinement under the Tennessee Community Alternatives to Prison Program (CAPP), was legally erroneous under U.S.S.G. § 4A1.1 and United States v. Rasco, 963 F.2d 132 (6th Cir.), cert. denied, 506 U.S. 883, 113 S.Ct. 238, 121 L.Ed.2d 173 (1992). Accordingly, because I would affirm the lower court's sentence imposed against Jones, I DISSENT from part IV of the majority opinion.
 
 
 77
 A federal jury convicted defendant Kathleen Kremser Jones on June 21, 1995 on each of the six counts of a superseding indictment[2] stemming from her fraudulent procurement of a Visa credit card issued in another person's name, and her use of that card to incur approximately $3,748.08 in illegitimate motel charges and automatic teller machine cash advances between July 8 and July 21, 1991. On August 4, 1995, the district court sentenced Jones to serve 27 months in federal prison, to be followed by three years of supervised release. The trial court had determined a 21 to 27 month sentencing range, which was the product of an offense level of nine matched with a criminal history category of VI. The sentencing court further ordered restitution of $3,748.08 and payment of a $300 assessment.
 
 
 78
 On appeal, Jones has faulted the lower court for counting her previous four year state court prison sentence for forgery entered on January 21, 1994, which she was serving in home confinement, as a "prior sentence of imprisonment exceeding one year and one month" under U.S.S.G. § 4A1.1(a), which accounted for three of her total thirteen criminal history points. Jones contends that a sentence of any length discharged in home confinement should trigger only one criminal history point under U.S.S.G. § 4A1.1(c).[3] If section 4A1.1(c) applies to her January 1994 forgery sentence rather than section 4A1.1(a), Jones should have been charged with, in sum, eleven criminal history points. This would have reduced her criminal history category to V, which, combined with an offense level of nine, would have produced a sentencing range of 18 to 24 months instead of 21 to 27 months. Sentencing Table, U.S.S.G. Chapter 5, Part A. If the appellant was correct, her 27 month sentence would have exceeded her maximum sentencing range by three months.
 
 
 79
 Chapter Four, Part A of the Sentencing Guidelines ("Criminal History") defines a "sentence of imprisonment" to be "a sentence of incarceration." U.S.S.G. § 4A1.2(b)(1). The ordinary meaning of "incarceration" encompasses detention in a public punitive institution as well as other forms of confinement, enclosure, or close constriction.[4] Clearly, a sentence of imprisonment served in home detention equals a "sentence of imprisonment" under Chapter Four of the guidelines, as the prisoner is "incarcerated" during that term, albeit outside of a public corrections facility. Had the Sentencing Commission intended to restrict the meaning of "imprisonment" to "incarceration in a correctional institution," it could have so stated.[5] Cf. Rasco, 963 F.2d at 135.
 
 
 80
 Under U.S.S.G. § 4A1.2, "criminal history points are based on the sentence pronounced, not the length of time actually served," id., commentary note 2 (emphasis added), as long as some of that time is actually served. Beyond contradiction, Jones was sentenced to serve four years of "incarceration" or "imprisonment" in January 1994, and had served part of that sentence (in home detention) by the time of her August 1995 sentencing in the case sub judice. The irrelevance of the place of that physical detention was established beyond dispute by this circuit's controlling decision in United States v. Rasco, 963 F.2d 132 (6th Cir.), cert. denied, 506 U.S. 883, 113 S.Ct. 238, 121 L.Ed.2d 173 (1992), which ruled that detention in a halfway house or a community treatment center upon revocation of parole constituted the equivalent of "incarceration" or "imprisonment" under the criminal history provisions (Chapter Four) of the Guidelines:
 
 
 81
 The guidelines do not expressly address whether residency in a halfway house or community treatment center constitutes imprisonment for purposes of Chapter Four. While section 4A1.2(b)(1) explains that "[t]he term 'sentence of imprisonment' means a sentence of incarceration," id. § 4A1.2(b)(1), the guidelines neither define "incarceration" nor state whether detention in a halfway house or community treatment center constitutes "incarceration" for purposes of computing a defendant's criminal history score. Rather than presuming the guidelines' silence on this point to have been merely an oversight in drafting, we prefer to view this apparent lacuna in the guidelines as indicative of the Sentencing Commission's intent that the sentencing court adopt a functional approach to resolving this issue, one that focuses on the reason for the defendant's detention, rather than an approach focusing exclusively on the place of the defendant's detention.
 
 
 82
 Id. at 135 (emphasis in the original; note omitted).
 
 The Rasco court further ruled:
 
 83
 We believe ... that section 4A1.2(k)[6] expresses the Commission's view that a sentence imposed upon revocation of parole, regardless of whether the sentence is served in prison, a halfway house, or a community treatment center, be added to the original term of imprisonment, requiring the sentencing court to count them as a single sentence for purposes of criminal history scoring. Thus, section 4A1.2(k) precludes a court from treating a sentence imposed upon revocation of parole as a distinct sentence deserving separate counting under section 4A1.1(a), (b), or (c). Given the many forms that a parole revocation may take, we are confident that the purpose of this section is best served by requiring the sentencing court to focus upon the fact that the sentence was imposed because of the defendant's violation of his parole, rather than on the place where the sentence was served.
 
 
 84
 Id. at 135-36.
 
 
 85
 The panel majority's effort to distinguish Rasco from the instant cause is less than persuasive. First, the panel majority has attempted to limit Rasco only to encompass cases in which the defendant had incurred a prior revocation of parole. The panel majority misconceives Rasco to rule that time served in a halfway house or community treatment center should be considered time served in "imprisonment" only where the defendant had already served time in prison for a prior offense, and then subsequently incurred additional confinement in a halfway house, community treatment center, or similar environment because he violated his parole or supervised release conditions on that offense.
 
 
 86
 Contrary to the panel majority's analysis, however, the absence of a parole violation in the instant appeal is entirely insignificant. The salient applicable principle mandated by Rasco was that time to be served in a halfway house constituted part of a "sentence of imprisonment" under Chapter Four, Part A (Criminal History Category) of the Guidelines, because the place of "imprisonment" was unimportant; rather, the reason for the defendant's confinement was deemed to control the characterization of such detention time as either the equivalent of time in prison or punishment distinct from time in prison. In Rasco, the defendant served time in a halfway house because he violated his parole conditions, which would justify his imprisonment; thus, the halfway house term was added to his previous sentence of imprisonment to calculate the criminal history points attributable to his underlying prior offense. See Rasco, 963 F.2d at 137. Similarly, a Tennessee court condemned Jones to four years in the state penitentiary because she had committed a felony which warranted a severe penalty; the ultimate place of service of that court-imposed captivity is irrelevant.
 
 
 87
 The panel majority, however, failed to focus upon the reason for Jones's detention by the state, but instead addressed the reason for her assignment to home detention. The panel majority resolved that it could not determine Tennessee's specific reason for consigning Jones to home confinement instead of the state reformatory without consulting Tennessee law, which articulated a public policy favoring reservation of prison space for violent felons. T.C.A. § 40-36-103(1). Because the panel majority posited that the meaning of terms used in the Sentencing Guidelines should be exacted with reference to federal law rather than state law, it declined to consult Tennessee law for purposes of delineating instances wherein "home confinement" equals a "sentence of imprisonment." Accordingly, the panel majority in effect concluded that because it could not discover the state's particular motive for placing Jones in home confinement instead of prison, it must assume that the state authorities had intended to punish her by means short of imprisonment.
 
 
 88
 This analysis derogates against Rasco. The Rasco court expressly posited that the reason for the defendant's sentence controlled the characterization of that sentence as one of imprisonment or as something else, rather than the place where the sentence would be served. Rasco, 963 F.2d at 135-36. However, the panel majority's analysis confused the state's reason for Jones's sentence of imprisonment (which is the pertinent Rasco inquiry) with the reason for the state's assignment of Jones to a particular place for the service of her sentence (which is irrelevant under Rasco ). Because the state's reason for assigning Jones to home confinement was immaterial, no reference to any state law policy to discover the reason for her detention in this particular place was necessary.[7]
 
 
 89
 The panel majority's invocations of Guidelines sections which purportedly differentiate "home detention" from "imprisonment" in contexts other than criminal history computations were again misconceived.[8] Chapter 5, Part F ("Sentencing Options") dictates that
 
 
 90
 Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment.
 
 
 91
 U.S.S.G. § 5F1.2.
 
 
 92
 Chapter 5, Part B ("Probation") contains a similar proviso:
 
 
 93
 Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment. See § 5F1.2 (Home Detention).
 
 
 94
 U.S.S.G. § 5B1.4(b)(20) (Policy Statement).
 
 
 95
 Additionally, Chapter 7, Part B ("Probation and Supervised Release Violations") directs that:
 
 
 96
 Any restitution, fine, community confinement, home detention, or intermittent confinement previously imposed in connection with the sentence for which revocation is ordered that remains unpaid or unserved at the time of revocation shall be ordered to be paid or served in addition to the sanction determined under § 7B1.4 (Term of Imprisonment), and any such unserved period of community confinement, home detention, or intermittent confinement may be converted to an equivalent period of imprisonment.
 
 
 97
 U.S.S.G. § 7B1.3(d) (Policy Statement).
 
 
 98
 These sections of the Guidelines merely authorize district courts to impose home detention as a condition of probation or supervised release where the court could have instead imposed a prison sentence, and empower the district courts to convert an unserved term of home confinement to a term of imprisonment as punishment for violation of the conditions of parole or supervised release. That the Guidelines distinguish between "home confinement" and "imprisonment" in these contexts does not mean that home confinement categorically may not be equated with imprisonment for purposes of determining the defendant's criminal history category. To the contrary, the Guidelines sections quoted above reflect the interrelationship and substitutability of institutional imprisonment and home confinement, which bolsters the conclusion that, where a defendant has been sentenced to time in a penitentiary but has been permitted to serve that time in alternate environs, that sentence should nonetheless be construed as a sentence of imprisonment under the criminal history assessment sections of the Guidelines.
 
 
 99
 This federal public policy militates against the panel majority's windfall award of a reduced sentence to Jones for her 1995 conviction simply because the State of Tennessee had magnanimously permitted Jones to discharge her 1994 custodial penalty for forgery in the comparatively pleasant surroundings of her own home, rather than in the penitentiary to which she had been rightfully condemned. The majority has unjustifiably ignored Guidelines-mandated prison time from the defendant's instant 1995 sentence by characterizing her prior prison sentence for forgery as a sentence which did not constitute "imprisonment" merely because, as a matter of grace and leniency by the state, that sentence was being served under conditions less onerous than those of a state prison.
 
 
 100
 Jones was ordered imprisoned by the Tennessee court for four years because she had pleaded guilty to a serious forgery charge. The ultimate conditions of that confinement are irrelevant to the fundamental policy which partially anchors the criminal history sections of the Guidelines, namely that sentencing should in part reflect the seriousness of the defendant's prior crime(s). The seriousness of such a previous crime is evidenced by the duration, not the place, of the prior punitory confinement sentence. See U.S.S.G. § 4A1.1, comment. (backg'd); Rasco, 963 F.2d at 135. The varying motivations which state criminal justice systems may have for assigning certain recipients of incarceration sentences to home detention rather than to a state-run house of corrections are immaterial to the characterization of such a convict's underlying prison sentence as one of "imprisonment" for purposes of tallying his or her criminal history points.
 
 
 101
 Accordingly, the majority's reversal of the lower court's addition of three criminal history points to the appellant's sentencing calculation for her 1994 state court four year sentence for forgery constitutes legal error. Because I would affirm the sentence imposed by the trial court, I DISSENT from part IV of the majority opinion, from the vacation of Jones's sentence, and from the remand of this case for resentencing. However, I CONCUR in the affirmation of Jones's conviction and join parts I, II, and III of the majority opinion.
 
 
 
 [1]
 The decision by the district court to admit this evidence did not, of course, prevent appellant from challenging its genuineness before the jury. See 5 JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE p 901(a), at 901-19 (1996) ("The [authentication] rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification. The rest is up to the jury.") (footnotes omitted)
 
 
 [2]
 The author of this opinion must confess that, without noting the conflicting precedent, she cited the Cook standard of review in a recent case. See United States v. Thomas, 74 F.3d 676, 681-82 (6th Cir.) (Moore, J.), cert. denied, --- U.S. ----, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996). That case, however, only dealt with whether the expert testimony at issue assisted the trier of fact, a determination involving the traditional abuse-of-discretion standard, even under Cook 's test. Id. at 682. We have also found two other published opinions citing the Cook standard. See Smelser v. Norfolk S. Ry., 105 F.3d 299, 302 (6th Cir.1997); CMI-Trading, Inc. v. Quantum Air, Inc., 98 F.3d 887, 890 (6th Cir.1996)
 
 
 [3]
 Rule 104(a) provides:
 (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
 Fed.R.Evid. 104(a).
 
 
 [4]
 The Ninth Circuit's statements in Lust are particularly interesting in light of the fact that it employed a de novo standard in its initial opinion in Daubert on the issue whether "a scientific technique '... is generally accepted as a reliable technique among the scientific community.' " Daubert v. Merrell Dow Pharm., Inc., 951 F.2d 1128, 1129 (9th Cir.1991) (citation omitted), rev'd, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)
 
 
 [5]
 In Dunagin v. City of Oxford, 718 F.2d 738, 748 n. 8 (5th Cir.1983), cert. denied, 467 U.S. 1259, 104 S.Ct. 3553, 3554, 82 L.Ed.2d 855 (1984), the Fifth Circuit appeared to endorse a more searching standard of review with respect to the "truths" espoused by social scientists
 
 
 [6]
 Incidentally, the Supreme Court's decision in Koon, which adopted a unitary abuse-of-discretion standard of review for appeals from a district court's decision to depart from the sentencing ranges in the Sentencing Guidelines, --- U.S. at ---- - ----, 116 S.Ct. at 2047-48, overruled the three-tiered standard that we had applied in cases such as United States v. Fletcher, 15 F.3d 553, 556 (6th Cir.1994). See also Cooter & Gell, 496 U.S. at 405, 110 S.Ct. at 2460 (rejecting a three-tiered standard of review in Rule 11 sanctions cases in favor of a unitary abuse-of-discretion standard)
 
 
 [7]
 Because of the lack of precedential support for a de novo standard, we rely principally on academic literature here to discuss the merits of such a standard
 
 
 [8]
 The facts in Cook also illustrate the difficulty in determining when to apply the de novo and deferential standards of review which that case offers. The plaintiff in Cook, who worked as a deckhand on a ship for the defendant, was injured when one of the ship's lines that was supporting him in the air parted. He contended that the line had parted in its normal functioning, and thus that the defendant's ship had been unseaworthy. The defendant employer countered that the plaintiff had burned the line himself with his torch. At trial, Michael Timmons, an expert in stress and failure testing, testified for the defendant that the line had parted from a "localized heat source." 53 F.3d at 739. On appeal, plaintiff contended that this testimony should not have been admitted. Although the court concluded that the district court did not clearly err in finding Timmons qualified as an expert in stress and failure testing, the court concluded, applying the de novo standard, that because Timmons failed to perform any tests on the line beyond merely visually analyzing it, his testimony was not based upon "scientific, technical, or other specialized knowledge" and, therefore, should have been excluded. Id. at 738-740. Thus, the court did not base its holding on general principles that transcended the particular dispute, i.e., that "line testing" is not a field of expertise under Rule 702. Instead, it focused on the fact that Timmons only had visually analyzed the particular line at issue, and thus had engaged in wholly inadequate testing of the line. But given the court's pronouncement of the standard of review, it is not entirely clear that the de novo standard was appropriate. Under the first prong of Cook 's three-part standard, the trial court's factfinding regarding "a determination of the tests or experiments that the proffered expert conducted, if any" are reviewed for "clear error." Id. at 738
 We wish to emphasize that we do not question the ultimate result in Cook. It certainly is a reasonable proposition that a district court clearly errs or abuses its discretion when it allows into evidence, over objection, wholly unreliable expert testimony. Our concern is that the three prongs neatly delineated in Cook 's pronouncement of the standard of review cannot always be neatly separated in practice.
 
 
 [9]
 In Pfeiffer, the Third Circuit returned to an abuse-of-discretion standard in its review of evidentiary decisions under Federal Rule of Evidence 402. A prior panel had stated that such review was "plenary" even though earlier panels in the Third Circuit and most of the other circuits had employed an abuse-of-discretion standard. 917 F.2d at 781
 
 
 [10]
 In deciding that handwriting analysis does not rest on "scientific" knowledge, we do not decide whether other tasks performed by forensic document examiners, such as the analysis of ink, ribbon, dye, or pencil lead; the determination of the age of a document; or the analysis of water-soaked documents are based on scientific knowledge. See generally 2 PAUL C. GIANNELLI & EDWARD J. IMWINKELRIED, SCIENTIFIC EVIDENCE §§ 21-3 to 21-6 (2d ed.1993) (discussing the numerous tasks performed by forensic document examiners)
 
 
 [11]
 It is also interesting to note a seldom cited federal statute dealing with the admissibility of handwriting testimony. 28 U.S.C. § 1731 provides: "The admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person." The approach taken by § 1731 is similar to that taken by Federal Rule of Evidence 901(b)(3). See Fed.R.Evid. 901(b)(3) advisory committee's note
 
 
 [12]
 As previously mentioned, the district court's ruling on this issue can be affirmed under either the de novo or abuse of discretion standard
 
 
 [13]
 Of course, under Koon v. United States, --- U.S. ----, ----, 116 S.Ct. 2035, 2048, 135 L.Ed.2d 392 (1996), we review a district court's decision to depart from the sentencing ranges in the Guidelines for abuse of discretion, and any legal errors made by the district court are by definition an abuse of discretion. See supra Part III.A
 
 
 [14]
 The dissent states that "[t]he majority's reliance upon Application Note 2 of the Commentary to U.S.S.G. § 4A1.2, as purportedly supporting the characterization of Jones's January 1994 forgery sentence as a non-'imprisonment' sentence, was misconceived." Dissenting Op. at 1167 n. 5. As our discussion above shows, however, Application Note 2 does not answer the question whether time spent in home detention constitutes a "sentence of imprisonment," and we do not rely on it to support our ultimate conclusion
 
 
 [15]
 The dissent suggests that "the panel majority's analysis confused the state's reason for Jones's sentence of imprisonment (which is the pertinent Rasco inquiry) with the reason for the state's assignment of Jones to a particular place for the service of her sentence (which is irrelevant under Rasco )." Dissenting Op. at 1169. This statement is misleading for numerous reasons. First, by stating that we "confused the state's reason for Jones's sentence of imprisonment," the dissent implies that we agree that Jones actually served a sentence of imprisonment. Whether such a sentence was served, however, is the issue that must be decided. Moreover, were we to conclude that Jones served a sentence of imprisonment, there would be no need under the Guidelines to ascertain the reason for her sentence. Additionally, even if we were to focus on the reason for her sentence (her state-law felony conviction), we would still be no closer to resolving whether her time spent in home detention constituted a sentence of imprisonment. That is, Jones was punished because she broke Tennessee law; this fact, however, sheds no light on whether the punishment actually imposed constituted a sentence of imprisonment. It is therefore apparent that the dissent's interpretation of Rasco does not strengthen the government's position in the least
 
 
 [16]
 Were we to look outside the Sentencing Guidelines to determine whether a sentence of home detention is a term of imprisonment, we would be guided by the Supreme Court's recent decision in Reno v. Koray, 515 U.S. 50, ----, 115 S.Ct. 2021, 2029, 132 L.Ed.2d 46 (1995), which held that "the time respondent spent at the Volunteers of America community treatment center while 'released' on bail pursuant to the Bail Reform Act of 1984 was not 'official detention' within the meaning of 18 U.S.C. § 3585(b)." We decline appellant's request to rely on Koray, however, not only because of the language difference between "official detention" and "sentence of imprisonment," but also because the two terms emanate from two different statutes. See United States v. Phipps, 68 F.3d 159, 161-62 (7th Cir.1995). With the Guidelines' cautionary instructions regarding different definitions in different sections of the Guidelines in mind, see U.S.S.G. § 1B1.1 commentary, applic. note 2, we prefer to confine our inquiry to the Guidelines themselves and not to venture out on a sojourn throughout the United States Code
 
 
 [17]
 Although home detention presumably can take many forms, the government does not contend that Jones's sentence, while labeled home detention, actually should have been classified as some other type of punishment. Because of this fact, it is unnecessary for us to delve into the specific requirements imposed on Jones by her sentence of home detention
 
 
 [18]
 After stating that our decision gives a "windfall award" to Jones, the dissent then asserts that "[t]he majority has unjustifiably ignored Guidelines-mandated prison time from the defendant's instant 1995 sentence by characterizing her prior prison sentence for forgery as a sentence which did not constitute 'imprisonment' merely because, as a matter of grace and leniency by the state, that sentence was being served under conditions less onerous than those of a state prison." Dissenting Op. at 1170-71. While it is intuitive that time spent in home detention is less onerous than time spent in prison, our conclusion in this case does not depend on whether the punishment Jones received was more or less onerous than prison time. Numerous situations could be imagined in which a heavy fine could be more severe than time spent in prison; yet, it hardly could be argued that even a crippling monetary sanction qualifies as a sentence of imprisonment. Cf. Phipps, 68 F.3d at 161 ("If one state decided that financial sanctions are sufficient for property crimes, no one would suppose that this produced a subtraction under § 5G1.3(b) on the ground that a heavy fine can be as severe as a period in the pokey. So too with other sanctions."). For better or worse, the Sentencing Commission chose to use prison time as a proxy for the severity of past offenses. Although this proxy may benefit the government in some cases and criminal defendants in others, our task is not to assess which party receives a "windfall" in each particular case; instead, we must interpret the Federal Sentencing Guidelines as we would any other statute. That is precisely what we do in the present dispute
 
 
 [1]
 On January 21, 1994, in case no. 65060, the Criminal Court of Knox County, Tennessee, convicted Jones of forgery (T.C.A. 39-14-114) committed on April 11, 1991, and sentenced her to four years in the custody of the Tennessee Department of Corrections, but referred her to the Tennessee Community Alternatives to Prison Program ("CAPP"), a state correctional program designed to provide alternative punitive environments for non-violent offenders in lieu of captivity in a "secure confinement facilit[y]." T.C.A. § 40-36-103(1). See J.A. at 53, 60, & 66
 
 
 [2]
 The jury convicted Jones of one count of mail fraud, 18 U.S.C. § 1341; two counts of using a fictitious or false name to defraud by mail, 18 U.S.C. § 1342; one count alleging the use of an unauthorized access device, 18 U.S.C. § 1029(a)(2); one count of theft or receipt of stolen mail, 18 U.S.C. § 1708; and one count of obstruction of correspondence, 18 U.S.C. § 1702. J.A. at 30-31
 3 U.S.S.G. § 4A1.1 provides in material portion:
 (a) Add 3 points for each prior sentence of imprisonment exceeding one year and one month.
 (b) Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a).
 (c) Add 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this item.
 
 
 [4]
 See, e.g., WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 1141 (1981) (defining the noun "incarceration" to encompass, inter alia, "1. a confining or state of being confined: IMPRISONMENT[,]" and defining the verb "incarcerate" as "1. to put in prison: IMPRISON 2. to shut up or away: CONFINE, ENCLOSE"); see also THE AMERICAN COLLEGE DICTIONARY 611 (1970) (defining the verb "incarcerate" to mean "1. to imprison; confine. 2. to enclose; constrict closely.")
 
 
 [5]
 The majority's reliance upon Application Note 2 of the Commentary to U.S.S.G. § 4A1.2, as purportedly supporting the characterization of Jones's January 1994 forgery sentence as a non-"imprisonment" sentence, was misconceived. Note 2 posits, in part, that
 [t]o qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence (or, if the defendant escaped, would have served time). See § 4A1.2(a)(3) and (b)(2).
 In turn, section 4A1.2(a)(3) provides that
 [a] conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence under § 4A1.1(c).
 (Emphasis added). Additionally, section 4A1.2(b)(2) mandates that
 [i]f part of a sentence of imprisonment was suspended, 'sentence of imprisonment' refers only to the portion that was not suspended.
 (Emphasis added).
 Thus, Note 2 to section 4A1.2 merely pronounces that sentences entirely suspended or stayed shall be credited for only one criminal history point irrespective of the length of such a sentence, and that suspended portions of sentences shall not be counted towards calculating the length of a sentence of imprisonment. Obviously, suspended incarceration time will not be served anywhere, and hence is not counted as prison sentence time. However, note 2 does not support the proposition, erroneously embraced by the panel majority, that actual service of a prison sentence in confinement conditions other than physical presence in a penal institution automatically renders such sentence something less than a "sentence of imprisonment."
 6 U.S.S.G. § 4A1.2(k)(1), which controls, in the criminal history tabulation process, the role of a "prior sentence" which had been imposed as a result of a revocation of parole, commands:
 In the case of a prior revocation of probation, parole, supervised release, special parole, or mandatory release, add the original term of imprisonment to any term of imprisonment imposed upon revocation. The resulting total is used to compute the criminal history points for § 4A1.1(a), (b), or (c), as applicable.
 
 
 [7]
 Indeed, the case sub judice presents a more compelling instance than Rasco for counting the term at issue as a sentence of imprisonment. The Background Commentary to U.S.S.G. § 4A1.1 recites in part:
 Subdivisions (a), (b), and (c) of § 4A1.1 distinguish confinement sentences longer than one year and one month, shorter confinement sentences of at least sixty days, and all other sentences, such as confinement sentences of less than sixty days, probation, fines, and residency in a halfway house.
 (Emphasis added).
 The Rasco court resolved:
 This commentary seems to equate confinement sentences with sentences of imprisonment and distinguish both from residency in a halfway house. We do not read this commentary, however, as categorically excluding detention in a halfway house from the definition of a "sentence of incarceration" for purposes of computing the applicable time period under section 4A1.2(e), nor do we read it as excluding halfway house placement from the definition of a "sentence of imprisonment" under section 4A1.2(k). Such an interpretation would elevate the importance of a defendant's place of detention over the reason for which the detention was imposed, thereby frustrating the position of section 4A1.2(k), that a sentence imposed upon revocation of parole be added to the original sentence regardless of where that sentence is served. To the extent that the commentary to section 4A1.1 conflicts with the mandates of section 4A1.2(k), we conclude that section 4A1.2(k) controls.
 963 F.2d at 137 (emphasis added).
 By contrast, U.S.S.G. § 4A1.1, commentary (backg'd) does not even arguably support the characterization of Jones's home confinement for forgery as something less than a "confinement sentence" (or "sentence of imprisonment"). Although the Commissioners therein expressly distinguished "residency in a halfway house" from a "confinement sentence," they did not distinguish "home detention" from a "confinement sentence." The Sentencing Commission's silence can only be interpreted to reflect an intent not to exclude "home detention" from the general category of "confinement sentences." This conclusion is bolstered by consideration of the more restrictive nature of home detention as compared to halfway house residency, which renders home confinement more akin to institutional incarceration. Whereas halfway house residency is a form of "community confinement" wherein the resident enjoys considerable freedom to engage in a variety of activities outside of the halfway house during "non-residential hours," U.S.S.G. § 5F1.1 & commentary (n. 1 & 2), a person under home detention is subject to "confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by all means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized." U.S.S.G. § 5F1.2, commentary (n. 1) (emphasis added). Indeed, the basic concept of a "halfway house" is a restrictive, supervisory, rehabilitative environment which is "halfway" between penal confinement and release into the general community. Moreover, the Guidelines permit a sentencing court to impose halfway house residency as a condition of probation or supervised release in any case, U.S.S.G. § 5F1.1 & commentary (n. 1), whereas a district court may impose home detention as a condition of probation or supervised release "only as a substitute for imprisonment." U.S.S.G. § 5F1.2 (emphasis added). Therefore, home confinement is more similar to imprisonment (or a "confinement sentence") than is halfway house placement. Thus, if time served in a halfway house constitutes "imprisonment" time under Rasco, a fortiori, time served in home detention must also constitute imprisonment time.
 
 
 [8]
 Definitions and concepts adopted for purposes of specific chapters, parts, or sections of the Guidelines do not necessarily control in other chapters, parts, or sections of the Guidelines, if diverse considerations inform their meaning in various contexts. For example, note 1 of the Commentary to U.S.S.G. § 1B1.1 promulgates definitions of various terms "that are used frequently in the guidelines and are of general applicability (except to the extent expressly modified in respect to a particular guideline or policy statement)." Note 2 then postulates:
 Definitions of terms also may appear in other sections. Such definitions are not designed for general applicability; therefore, their applicability to sections other than those expressly referenced must be determined on a case by case basis.
 See Rasco, 963 F.2d at 137.