NOT RECOMMENDED FOR PUBLICATION
File Name: 12a0143n.06

No. 10-5753

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Feb 06, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE MIDDLE DISTRICT OF |
| | ) | TENNESSEE |
| SUSAN SPERL, aka Susan Boyer and Susan | ) | |
| Berry, | ) | |
| | ) | OPINION |
| Defendant-Appellant. | ) | |
| | ) | |

**Before: GILMAN, ROGERS, and STRANCH, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Susan Sperl, the owner of the accounting-services firm SusanTax, was accused by the IRS of engaging in several schemes to help her clients falsify their tax returns. Following a jury trial on two of the counts against her and a bench trial on the five remaining counts, she was convicted on all seven counts of conspiracy and tax fraud.

On appeal, Sperl seeks to reverse each of her convictions. She claims that the district court abused its discretion by improperly admitting, in the jury trial, hearsay testimony regarding a prior consistent statement of a prosecution witness and, in the bench trial, by allowing unduly prejudicial evidence of Sperl's prior bad acts. Sperl also asserts that the government did not present sufficient evidence of her guilt to support a conviction on any count. As for her 36-month sentence, Sperl contends that the district court erred by imposing enhancements for obstruction of justice, use of

sophisticated means, and having a leadership role in the offense. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Sperl was charged in a nine-count indictment in April 2007. Two of the counts—6 and 7—were later dismissed by the government. The remaining counts involved three separate schemes to falsify income-tax returns submitted to the Internal Revenue Service (IRS). Counts 1 and 2 were tried before a jury, but Sperl waived her right to a jury for Counts 3, 4, 5, 8, and 9, choosing a bench trial instead. Sperl was convicted on all seven remaining counts during the course of the two separate trials. The details of each count are set forth below.

### A.     Counts 1 and 2

In Counts 1 and 2 of the indictment, Sperl was alleged to have violated 18 U.S.C. § 371 and 26 U.S.C. § 7206(2) by conspiring with codefendant David Michaels to assist Bryan Wolf and Harold Strong, the owners of InSite Services, in falsifying their federal income-tax returns. Wolf and Strong each pleaded guilty to one count of conspiracy to commit tax fraud and agreed to cooperate with the government by testifying against Michaels and Sperl in exchange for more lenient sentences. At trial, Wolf and Strong testified to the following:

Federal tax law required Wolf and Strong to declare InSite's earnings on their personal income-tax returns because InSite was an "S" corporation. In 2001, Wolf and Strong were paying at least 39% of their income in taxes and were seeking ways to reduce their tax liabilities. They discussed ideas for reducing their taxes with Michaels, the owner of Mid-Atlantic Personnel. Mid-Atlantic provided InSite with health-benefits plans, insurance, and 401(k) plans. Michaels suggested

that Wolf and Strong move their money into offshore accounts, where it would be "undetected by the IRS." He recommended Sperl as an accountant who could facilitate transferring InSite's taxable income overseas.

The plan called for InSite to write a check to Mid-Atlantic, "providing an additional layer of separation." Michaels would then write a check to Sperl, Sperl would cash the check and transfer the money through several accounts until the funds landed in an overseas account, and then Sperl would give Wolf and Strong access to the account through a debit or credit card. The final step of the plan involved Wolf working with Michaels to write off the funds as if InSite had spent them on a legitimate tax-deductible item, thereby reducing their taxable incomes.

In September 2001, Wolf and Strong contacted Sperl for the first time, with Michaels participating in the phone call. The "gist of the conversation was . . . how to transfer the funds without the IRS finding out about it." During the call, Wolf and Strong were assured that Michaels and Sperl "had done it previously and were successful a number of times, and . . . that Ms. Sperl would transfer the money through a number of her trust accounts, combine it with other funds, you know, take it away and basically provide a number of intermediary transactions to disguise the whole thing so we would not be caught." Wolf and Strong knew that this was tax evasion and were both worried about the IRS taking action against them. But at no time during the call did anyone affirmatively state that this scheme was illegal.

Wolf and Strong initially decided to move $100,000 offshore. They sent the money to Michaels, who immediately transferred $80,000 of it to Sperl. Sperl told them that she would take $40,000 as a onetime setup fee ($20,000 from both Wolf and Strong), "and then 10% of any money

transferred thereafter." Michaels subsequently provided Wolf and Strong, per Wolf's request, with

an invoice stating that InSite had paid Mid-Atlantic $100,000 for research-and-development services.

Wolf then gave the invoice to InSite's tax accountant to ensure that the accountant deducted the

$100,000 from InSite's gross income. But Wolf knew that InSite had in fact incurred no such

expense.

Approximately seven weeks after Michaels transferred the $80,000 to Sperl, the three men

had trouble reaching Sperl to find out where the money was. Wolf and Strong were very upset

because they had been promised that Sperl would set up accounts in a timely manner so that they

could access their money. By December 2001, they "didn't have any accounts and didn't know

where [their] money was." Michaels sent Sperl the following fax on December 17, 2001:

> In our conference call you affirmed your ability to facilitate this. Now, seven weeks
> later you are telling us nothing has happened and you don't know where the money
> is.
> . . . .
> When you tell me you sent a money order out of the country to a non-proven source
> that talks to you every other day . . . , that's crazy. A person of your experience
> would never send money orders as good as cash and four days later not have a
> response from the recipient and had not canceled the money order . . . [or] pay[ ] for
> wires that are not accepted by the bank in Zurich.
> . . . .
> My understanding was that we received $50,000 each, setup of [$]20,000, . . . minus
> . . . a total cost of [$]2,500[. Thus the] balance to be deposited per account equals
> [$]27,500.

Wolf and Strong, however, never received the amount stated above from Sperl. But Sperl

did eventually set up two accounts for them in a Tennessee bank, each with $1,500, and provided

them with debit cards to withdraw the money. She told Wolf and Strong that she kept the total

deposit under $10,000 to avoid any reporting to the IRS, but no other deposits were ever made. The

accounts were then suddenly closed, and Sperl informed Wolf that the IRS had seized all of her accounts. Sperl urged Wolf not to worry because she had told the IRS agents that Wolf and Strong were setting up a legitimate coffee-bean or textiles business and that no money had left the United States. When Wolf and Michaels were later contacted by the IRS, Michaels told Wolf to "stick" to Sperl's coffee-beans-and-textiles story.

### B.      Counts 3, 4, and 5

In Counts 3, 4, and 5, Sperl was charged with participating in another illegal tax scheme. This time her alleged coconspirator was Michael Ray, a coowner of Tender Loving Nurses (TLN), a Texas company that contracted with hospitals in the Houston area to provide them with critical-care nursing staff. Sperl had been preparing Ray's personal income-tax returns for a few years before he founded TLN. In November 2000, Ray asked Sperl to prepare TLN's 2000 tax return.

The indictment charged Sperl and Ray with "engaging in transactions to create the appearance of legitimate business expenses for TLN in an attempt to fraudulently understate TLN's business income." In Count 3, Sperl and Ray were charged with conspiracy under 18 U.S.C. § 371. Sperl was charged in Count 4 with willfully preparing—aided and abetted by Ray—a fraudulent Form 1065 with TLN's 2000 partnership income-tax return, in violation of 26 U.S.C. § 7206(2). In Count 5, Sperl was charged with aiding and abetting Ray in knowingly making and subscribing the falsified Form 1065, in violation of 26 U.S.C. § 7206(1). Ray pleaded guilty to conspiracy to commit tax fraud pursuant to a plea agreement and agreed to cooperate with the government in exchange for a more lenient sentence. The following is a summary of Ray's testimony at trial regarding the alleged conspiracy:

Sperl traveled to Houston in November 2000 to determine TLN's quarterly payroll taxes. After she reviewed TLN's records, she told Ray that she could help him save money on his year-end taxes. Sperl estimated that TLN would have a profit of $240,000 for the year. On cross-examination, Ray could not recall how, in November, Sperl had come up with that estimate.

Sperl instructed Ray to write a check made out to her for $140,000 and to write in the memo section that it was for accounting and legal fees. She told Ray "that no one could tell [him] how much she could charge [him] for the services that she provided." But Sperl did not perform $140,000 worth of services. She immediately cashed the check and then had a $140,000 cashier's check made out to Ray as a loan. Sperl told Ray that she had done this type of transaction before and never had any problems with it.

With the remaining $100,000 in profit for the year 2000, Ray made a check out to Sperl in that amount, again writing "accounting and legal fees" in the memo section. Sperl immediately provided Ray with three checks for $33,000 apiece. Each check had written on it "Investment and loan number" followed by the numeral 1, 2, or 3 respectively. But there was no actual loan. Ray was to cash the three $33,000 checks once his $100,000 check to Sperl had cleared. Sperl kept the remaining $1,000 as a fee. She provided Ray with an invoice for $100,000, but she never provided $100,000 worth of services to TLN. Sperl told Ray that "she could bill [him] for whatever she wanted and then she could give [him a] loan back if she wanted."

Ray did not receive TLN's 2000 year-end tax return from Sperl until the fall of 2001. (The record does not contain any explanation for why TLN's 2000 tax return was prepared so late in 2001.) On the return, Sperl had deducted $240,000 from the actual net income as retirement-plan

expenses, leaving TLN with a falsified net income of $6,140. Ray knew at the time he filed TLN's

tax return that the return was false. Sperl also prepared Ray's 2000 personal tax return, which

reported that Ray's share of profits that year was $3,070. But Ray knew at the time that he had

earned much more than that.

At around the same time that Sperl was preparing his tax return, Ray was attempting to obtain

a mortgage for a home that he wished to purchase for $440,000. He told her that he needed a tax

return to submit to the mortgage company. Sperl told him that she would prepare another version

of TLN's 2000 tax return for Ray to provide to the mortgage company. On that version, Sperl

showed the net income for TLN as $246,140, which was exactly $240,000 more than the net income

on the version filed with the IRS.

## C.      Counts 8 and 9

In Counts 8 and 9 of the indictment, Sperl was charged with aiding in the preparation of

fraudulent 2003 and 2004 tax returns for her clients, John and Deborah Dotson, in violation of 26

U.S.C. § 7206(2). The Dotsons were not operating any business in those years, and they never told

Sperl that they were. Nevertheless, the Dotsons' 2003 and 2004 tax returns stated that they had

$8,000 and $5,000, respectively, in net income from a maintenance business. By having the business

income declared on their tax returns, the Dotsons were able to receive a bigger refund because the

added income enabled them to qualify for the earned-income tax credit. Sperl also received a larger

fee because of the greater refund, according to Deborah Dotson.

The Dotsons did not provide the business-income figures to Sperl. In fact, Deborah Dotson testified that her husband had only one lung and was too ill with chronic obstructive pulmonary disease and emphysema to run any business. He died in March 2009.

### D.    Sentencing

Following Sperl's convictions on the seven counts, the district court held a sentencing hearing. The Presentence Report prepared for the hearing showed that Sperl's base offense level under the U.S. Sentencing Guidelines was 20. Four sentencing enhancements added 8 points to the base offense level and brought the total offense level to 28. With a criminal history category of I, the Guidelines advisory range for Sperl's sentence was 78 to 97 months of imprisonment.

Sperl, however, challenged three of the four enhancements recommended in the Presentence Report. She claimed that she did not qualify for the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1, the sophisticated-means enhancement under U.S.S.G. § 2T1.4(b)(2), or the leadership-role enhancement under U.S.S.G. § 3B1.1(c). The district court overruled her objections but, because of various mitigating factors, ended up sentencing Sperl to 36 months in prison, less than half of the low end of the applicable Guidelines range. This timely appeal followed.

## II. ANALYSIS

On appeal, Sperl challenges both her convictions and her sentence. She argues that the district court erred in an evidentiary ruling made during the jury trial and in one made during the bench trial. Sperl also claims that there was insufficient evidence to convict her on any of the counts. As for her sentence, Sperl insists that the district court improperly imposed three of the four sentencing enhancements. Each of her arguments is addressed in turn below.

**A.    Prior consistent statement admitted during the jury trial**

Sperl first argues that the district court abused its discretion in the course of the jury trial on

Counts 1 and 2 by permitting InSite's corporate attorney, Stephen Jacobson, to testify regarding

certain out-of-court statements made by Wolf. Jacobson represented Wolf during an IRS interview

regarding Wolf's business relationship with Sperl. At trial, the government called Jacobson to testify

about what occurred during that interview.

Jacobson testified that, before the IRS interview, Wolf had told him that Wolf and Strong had

given money to Sperl to invest in coffee beans or textiles. During the interview, according to

Jacobson, Wolf told the IRS agents the same story. The agents then showed Wolf falsified invoices

from Mid-Atlantic Personnel for research-and-development expenses that had nothing to do with

coffee beans or textiles. Upon seeing these documents, Jacobson became "concerned that Mr. Wolf

might have some criminal exposure," so he asked for a break to confer with Wolf. Jacobson testified

that, while he was conferring with Wolf, Wolf told him that

> the arrangements with Mr. Michaels and Ms. Sperl had nothing to do with [an] actual
> business opportunity, but, in fact, they had been presented with a proposal that they
> would receive an invoice for services or [an] investment [but] that in fact . . . the
> monies were going to be channeled through Mr. Michaels and Ms. Sperl and be set
> up in offshore bank accounts to which they would have access through credit or debit
> cards of some sort; and that they had, in fact, transmitted money with no intention of
> making any business investment but rather having the money offshore and some
> documentation so they could take a deduction.

Sperl objected to this testimony as hearsay, but the district court overruled the objection on the

ground that Sperl had "made a very broadside attack on [Wolf's] credibility" and, therefore, the

testimony was permitted as a "prior consistent statement" under Rule 801 of the Federal Rules of Evidence.

Rule 801(d)(1)(B) provided at the time of Sperl's jury trial that "[a] statement is not hearsay if . . . the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B) (2008). To qualify as a prior consistent statement, "the declarant must have made [the statement] before the motive to fabricate or improper influence or motive arose." *United States v. Toney*, 161 F.3d 404, 408 (6th Cir. 1998). Sperl contends that the district court erred by failing to determine whether Wolf's statements to Jacobson were made before or after he had the motive to lie. She further claims that Wolf's motive to lie arose during his interview with the IRS, which was just prior to his conference with Jacobson.

An improper admission of testimony warrants reversal, however, only if the error was prejudicial. *United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004). That is, reversal is appropriate only if the error "more probabl[y] than not . . . materially affected the verdict." *Id.* Sperl argues that the improper admission was prejudicial because there was "no effective impeachment of the inadmissible hearsay elicited from Jacobson," and because the alleged hearsay, along with the live testimony from Wolf that it corroborated, were the only nonspeculative evidence demonstrating that Sperl had the requisite intent to commit tax fraud. She claims that the remaining evidence, "at worst, demonstrates that [she] attempted, unsuccessfully, to invest [InSite's] money in coffee beans or textiles . . . ."

Sperl, however, overstates the weight of Wolf's out-of-court statements to Jacobson by ignoring the ample evidence presented from other sources that confirmed Wolf's direct testimony about Sperl's intent. For example, Strong corroborated nearly all of Wolf's testimony, including Wolf's assertion that Sperl had made up the coffee-bean-and-textiles cover story. In addition, the fax sent to Sperl by Michaels demanding that she explain what happened to the $100,000 never mentions anything about coffee beans or textiles. Patrice Ancelot, Sperl's assistant, also testified that Sperl never mentioned anything about coffee beans or textiles when she told him to find offshore accounts for InSite's money. Thus, even if the admission of Jacobson's testimony was improper, it was harmless and does not warrant a reversal. We therefore have no need to determine whether the statements made by Wolf to Jacobson were properly admitted.

**B.      Evidence of prior bad acts admitted during the bench trial**

Sperl next challenges an evidentiary ruling made in the course of the bench trial on Counts 3, 4, 5, 8, and 9. At that trial, the government sought to introduce evidence that Sperl had prepared false tax returns in the past for Phillip Ibanez, Fred Sartuche, and Megan Vasquez. Sperl objected to the admission of these alleged prior bad acts. The district court overruled her objection, concluding that the evidence was admissible under Rule 404(b) of the Federal Rules of Evidence to prove Sperl's specific intent to falsify the Dotsons' tax returns as charged in Counts 8 and 9. We review the admission of evidence relating to prior bad acts under the abuse-of-discretion standard. *United States v. Hardy*, 643 F.3d 143, 150 (6th Cir. 2011).

Rule 404(b) of the Federal Rules of Evidence provided at the time of Sperl's bench trial that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in

order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Fed. R. Evid. 404(b) (2010). Before admitting Rule 404(b) evidence, the district court must (1) "make a preliminary determination regarding whether there is sufficient evidence that the 'other acts' took place," (2) "determine whether those 'other acts' are admissible for a proper purpose under Rule 404(b)," and (3) "determine whether the 'other acts' evidence is more prejudicial than probative." *United States v. Bell*, 516 F.3d 432, 440-41 (6th Cir. 2008) (internal quotation marks omitted).

Sperl argues that the district court erred in applying steps one and three. She first contends that "[t]he proof at trial called into serious question whether Sperl knowingly prepared tax returns with false deductions for Megan Vasquez, Fred Sartuche, and Phillip Ibanez." At trial, however, there was ample proof that Sperl had knowingly falsified all three witnesses' tax returns. Vasquez testified that Sperl prepared her 2002, 2003, and 2004 personal income-tax returns and that, after being audited by the IRS, Vasquez discovered that Sperl had made several improper deductions from Vasquez's taxable income in those years. Importantly, Vasquez testified that she provided no information to Sperl indicating that Vasquez qualified for those deductions. In other words, Sperl had no basis to believe that the deductions were accurate.

Sartuche's testimony was similar. Sperl prepared his 2001, 2002, 2003, and 2004 personal income-tax returns and deducted business losses for a fishing business that Sperl knew he did not have. In fact, he testified that Sperl told him specifically that he should *think* about forming a fishing

business. Sartuche said that, following an audit, he had to pay the IRS approximately $27,000 in back taxes and penalties for those erroneous deductions.

Much like the other two witnesses, Ibanez testified that he had many improper business deductions on his 2001, 2002, 2003, 2004, and 2005 personal income-tax returns that Sperl had prepared for him. Ibanez testified that he provided no information to Sperl to indicate that he qualified for those deductions, and that he was paying back taxes to the IRS for those years at the time of the trial.

Some of the direct testimony by Vasquez, Sartuche, and Ibanez was undercut on cross-examination by certain inconsistencies or memory lapses. But the evidence was still sufficient for a rational factfinder to conclude that Sperl had the specific intent to falsify the tax returns in question. *See Bell*, 516 F.3d at 441 (holding that proof of the prior bad acts is sufficient "if the jury can reasonably conclude that [they] occurred").

Sperl also asserts that the evidence was unfairly prejudicial. But a district court's determination that the probative value of Rule 404(b) evidence is not substantially outweighed by its unfair prejudice "is afforded great deference." *Id.* at 445. "'Unfair prejudice' . . . means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Hathaway*, 798 F.2d 902, 909 (6th Cir. 1986) (internal quotation marks omitted). Because this evidence was admitted during a bench trial, there was little danger of any prejudicial impact. *See United States v. Hall*, No. 98-6421, 2000 WL 32010, at *2 (6th Cir. Jan. 4, 2000) (per curiam) (unpublished opinion) (noting that undue prejudice was unlikely in a bench trial where "the application of the unfair prejudice portion of Rule 403 has been seen as an

unnecessary and 'useless procedure'" (quoting 22 Charles Alan Wright & Kenneth W. Graham, Jr.,

*Federal Practice and Procedure* § 5213 (1978 & Supp. 1999))).

Moreover, because Sperl claimed that she truly believed that the Dotsons ran a maintenance

business and that she properly added the business's income to their tax returns, the probative value

of the other-acts evidence was significant. *See United States v. Mitts*, 396 F. App'x 296, 300 (6th

Cir. 2010) (holding that the taxpayers' testimony of their accountant's uncharged fraud was more

probative than prejudicial because the testimony "belied his defense that the returns reflected his

good-faith understanding of each taxpayer's situation, as well as his suggestion that the taxpayers

had somehow mislead him"). Sperl therefore failed to demonstrate that the testimony of Ibanez,

Sartuche, and Vasquez was unduly prejudicial.

In sum, Sperl's challenge to the "other acts" evidence admitted pursuant to Rule 404(b) is

without merit. We therefore conclude that the district court did not err in considering the testimony.

**C.     Sufficiency of the evidence to convict Sperl**

In a final challenge to her convictions, Sperl claims that there was insufficient evidence

presented at either the jury trial or the bench trial to convict her on any of the counts charged. We

"review de novo a challenge to the sufficiency of the evidence supporting a criminal conviction."

*United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (internal quotation marks omitted). "The

relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Id.* (emphasis in original) (internal quotation marks omitted). In addition, the reviewing

court must "make all reasonable inferences and credibility choices in support of the jury's verdict."

*United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990).

After filing its brief in this case, the government submitted citations to supplemental authorities under Rule 28(j) of the Federal Rules of Appellate Procedure, arguing that Sperl waived her sufficiency-of-evidence objection by failing to raise a motion for a judgment of acquittal at the bench trial or to renew a motion for the same at the jury trial. Sperl counters that she did not waive the objection during either trial. Because there was sufficient evidence to convict Sperl on all counts, however, we do not need to determine whether she has procedurally waived her right to challenge the sufficiency.

### 1.       *Counts 1 and 2*

Sperl first argues that the government did not meet its burden of proving beyond a reasonable doubt that she was part of the tax-evasion conspiracy between Michaels, Wolf, and Strong as alleged in Count 1. To be guilty of conspiracy, Sperl must have "kn[own] of and adopted the conspiracy's main objective." *See United States v. Bibby*, 752 F.2d 1116, 1124 (6th Cir. 1985). "[D]irect evidence of the conspiracy is not necessary. It is enough to present circumstantial evidence [that] a reasonable person could interpret as showing participation in a common plan." *Fisher*, 648 F.3d at 450 (internal quotation marks omitted).

Sperl contends that she did not adopt the main objective of the conspiracy, which was to hide InSite's earnings from the IRS. Rather, she claims that her intent was to earn a substantial fee. This argument, however, confuses the purpose of the conspiracy with the personal benefits each conspirator expected to gain. Sperl undoubtedly participated in the conspiracy for the $20,000-plus

fee she expected to earn, as did Michaels. But Sperl would earn the $20,000 only by helping Wolf and Strong illegally hide InSite's earnings from the IRS. Although Sperl may have been motivated by her fee, the testimony of Wolf, Strong, and Ancelot established that she "knew of and adopted" the main objective of the conspiracy when she took Wolf's and Strong's money and tried to move it overseas. The evidence was therefore sufficient to convict Sperl on Count 1.

Under Count 2, Sperl was charged with violating 26 U.S.C. § 7206(2). The elements of § 7206(2) are "1) willfully aiding, assisting, procuring, counseling, advising, or causing, 2) the preparation or presentation of a federal income tax return, 3) that contains a statement of any material matter known by the defendant to be false." *United States v. Searan*, 259 F.3d 434, 443 (6th Cir. 2001). "This court long ago recognized that the 'willfully aiding, assisting, procuring, counseling, advising, or causing' language of § 7206(2) effectively incorporates into this statute the theory behind accomplice liability." *Id.* "Aiding and abetting" complicity liability "has two components: an act on the part of a defendant [that] contributes to the execution of a crime and the intent to aid in its commission." *Id.* at 444 (internal quotation marks omitted).

Here, Sperl attempted to move $100,000 overseas in order to allow Wolf and Strong to illegally deduct that amount from InSite's income. The fact that she was not the one to prepare or sign the tax returns on which Wolf and Strong falsely stated InSite's income does not preclude her conviction under § 7206(2). *See id.* at 445 (concluding that the defendant violated § 7206(2) despite the fact that another person "prepared and signed most of the returns in question"). Thus, Sperl's conviction on Count 2 also stands.

## 2.       *Counts 3, 4, and 5*

Sperl was convicted under Count 3 of conspiring with Ray to illegally understate TLN's net income in its partnership tax returns. She claims that no rational factfinder could have found her guilty of this conspiracy because Ray testified at trial that he "never intended to defraud the government" at any time. Ray also testified, however, that when TLN's tax return—prepared by Sperl—was filed with the declaration that TLN had paid $240,000 in retirement-plan expenses and had only $6,140 in net income, he knew that the return was false.

When reconciling Ray's two inconsistent statements in the light most favorable to the government, a rational factfinder could have found that Ray was either trying to minimize his culpability by not equating a falsified tax return with "defraud[ing] the government," or was using the word "intended" to mean "set out." Moreover, Ray pleaded guilty to conspiracy to commit tax fraud.

The other inconsistencies that Sperl points to in Ray's testimony go to the issue of credibility, but the district court obviously accepted Ray's testimony as credible when it convicted Sperl. Because Ray's testimony was not "so internally inconsistent or implausible on its face" as to negate it being credited by a reasonable factfinder, we must give considerable deference to the district court's credibility determination. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (holding that a district court's credibility determinations "demand[] even greater deference" than its other factual findings "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").

Sperl also challenges the sufficiency of the evidence necessary to convict her on Counts 4 and 5. Both counts charged Sperl with knowing that TLN's Form 1065 submitted to the IRS was false. She asserts that the government's proof at trial supported her belief that TLN was entitled to the $240,000 retirement-plan deduction stated on Form 1065. But the government presented evidence that Sperl knew that the Form 1065 tax return was incorrect and that there were no legitimate retirement-plan expenses.

Ray testified that he wrote checks to Sperl totaling $240,000 in November 2000 per her direction, and that she gave him the money right back, demonstrating that she knew that Ray had no intention of using the money for a retirement plan. In addition, Ray testified that when he told Sperl he was applying for a mortgage, she sent him another tax return without the $240,000 retirement-plan deduction. A rational trier-of-fact could therefore reasonably find that Sperl knew the retirement-plan deduction was false.

### 3.    *Counts 8 and 9*

Finally, Sperl argues that inconsistencies in Deborah Dotson's testimony made it impossible to rationally find Sperl guilty of assisting in the preparation of fraudulent 2003 and 2004 income-tax returns for the Dotsons. Once again, Sperl is asking us to disagree with the district court's determination of a witness's credibility—something we would do only in egregious circumstances. *See Anderson*, 470 U.S. at 575.

As proof of Dotson's allegedly inconsistent testimony, Sperl points to Dotson's assertion that Sperl never reviewed the tax returns with Dotson, in contrast to Dotson's admission that she and her husband signed the returns after receiving them from Sperl. This testimony is not in conflict,

however, because one can receive and sign copies of tax returns without reviewing them with the sender.

Sperl next contends that Dotson's testimony that her husband was too ill to run a maintenance business was inconsistent with her testimony that her husband performed miscellaneous maintenance jobs such as detailing and changing the oil of automobiles. A rational factfinder, however, could conclude that the ability to take on sporadic mechanical work is much less taxing than running one's own maintenance business. The two statements by Dotson are thus not mutually exclusive.

In addition, Sperl claims that Dotson must be lying about her income because her family of four could not have lived on the little that Dotson testified she and her husband brought in during 2003 and 2004. Sperl therefore contends that there must have been business income. But Dotson's testimony was not inconceivable given that the Dotsons had the aid of free housing, food stamps, and Supplemental Security Income for their son. Many families live very frugally, and the fact that the Dotsons qualified for food stamps corroborates the fact that they had a very low income. Dotson's testimony was not so inconsistent as to be implausible or to warrant the unusual course of reversing the trial court's credibility determination. We therefore decline to set aside Sperl's convictions on Counts 8 and 9.

**D.     Sentencing enhancements**

Having determined that Sperl's convictions should stand, we now turn to her sentence. She argues that the sentence should be vacated because the district court erroneously applied sentencing enhancements for obstruction of justice under U.S.S.G § 3C1.1, sophisticated means under U.S.S.G.

§ 2T1.4(b)(2), and undertaking a leadership role under U.S.S.G. § 3B1.1(c). A district court must find that a preponderence of the evidence supports a sentencing enhancement before imposing it. *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003). We review that finding under the clear-error standard. *United States v. Angel*, 355 F.3d 462, 475 (6th Cir. 2004).

### 1. *Obstruction of justice*

Sperl first argues that the obstruction-of-justice enhancement was improper because the government offered no evidence that her alleged instruction to Wolf—that he should tell the IRS that she was helping InSite invest in coffee beans or textiles—impeded any investigation. The obstruction-of-justice enhancement applies, however, where a defendant "willfully obstructed or impeded, *or attempted to obstruct or impede*, the administration of justice with respect to the investigation . . . of the instant offense of conviction . . . ." U.S.S.G § 3C1.1 (emphasis added). This includes "unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, *or attempting to do so*." *Id.*, cmt. n.4(a) (emphasis added). The enhancement may therefore be imposed even if the investigation was not actually impeded by Sperl's attempt to influence Wolf.

Sperl cites *United States v. Williams*, 952 F.2d 1504, 1516 (6th Cir. 1991), for the principle that a false statement given by the defendant to investigators that "fooled no one" is not enough to impose the obstruction-of-justice enhancement. But this principle is inapplicable where the defendant is accused of trying to influence *someone else* to lie to authorities. Under this latter scenario, all that is necessary is an attempt to do so; whether the attempt was successful is irrelevant. *United States v. Grigsby*, 338 F. App'x 514, 517 (6th Cir. 2009) (concluding that there was

"sufficient foundation to support [an obstruction-of-justice] enhancement" because the witness "testified that Grigsby *attempted* to influence [the witness's] testimony" (emphasis added)).

In regard to Counts 3, 4, and 5, Sperl also argues that there was no proof that she tried to coach Ray about what to tell IRS agents. But Ray testified that Sperl instructed him to say that they were "passing money back and forth, [they] were doing loans," which Ray acknowledged was a lie. Sperl's argument is thus without merit.

In sum, evidence was presented to show that Sperl attempted to have both Wolf and Ray lie to the IRS. The district court's decision to impose the obstruction-of-justice enhancement was therefore not clearly erroneous.

### 2. Sophisticated means

Sperl's objection to the imposition of the sophisticated-means enhancement similarly fails. She claims that the means that she allegedly used to commit these offense were not "especially complex or especially intricate," as required by the U.S. Sentencing Guidelines for the enhancement to apply. *See* U.S.S.G. § 2T1.4, cmt. n.3. The Guidelines, however, specifically state that the use of "offshore financial accounts ordinarily indicates sophisticated means." *Id.* Because testimony was presented to show that Sperl attempted to move money offshore and also attempted to hide money through a series of loans and false invoices, the district court did not clearly err in concluding that the sophisticated-means enhancement applied.

### 3. Leadership role

In the last challenge to her sentence, Sperl contends that the district court erred in applying the leadership-role enhancement. Under U.S.S.G. § 3B1.1(c), if Sperl "was an organizer, leader,

manager, or supervisor in any criminal activity," she is subject to a 2-point Guidelines enhancement. Factors for determining whether she undertook such a role include "the exercise of decision making authority, the nature of participation in the commission of the offense, . . . the degree of participation in planning or organizing the offense, . . . and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. n.4.

The testimony with regard to Counts 1 through 5 provided sufficient proof that Sperl took control and possession of the money that was to be hidden from the IRS and devised methods to move it through various accounts so as to make it untraceable. For Counts 1 and 2, Michaels arguably played the greater leadership role, but this fact does not undermine Sperl's own leadership role. *See id.* (noting that more than one person can be a leader or organizer of a conspiracy). And for Counts 3, 4, and 5, Sperl clearly managed the scheme to hide TLN's assets and decided how the transactions between her and Ray would occur. This sentencing enhancement was therefore correctly applied.

### 4. *Below the Guidelines sentence*

Despite Sperl's objections to the various sentencing enhancements, we note that she makes no comment about the fact that her 36-month sentence is less than half of the low end of the applicable Guidelines range of 78 to 97 months of imprisonment. In fact, the advisory Guidelines range without any of the enhancements (i.e., at an offense level of 20 and a criminal history category I) would be 33 to 41 months. U.S.S.G. Ch. 5, Pt. A, sentencing table (2009). Thus, even without any of the enhancements, Sperl could have received a within-Guidelines sentence significantly longer than 36 months. Sperl should therefore consider herself fortunate that the district

court varied downward from the applicable Guidelines range, especially because a within-Guidelines

sentence is considered presumptively reasonable on appeal. *See United States v. Reilly*, 662 F.3d

754, 760 (2011) (noting that "sentences that fall within the applicable Guidelines range are rebuttably

presumed to be reasonable" (brackets and internal quotation marks omitted)).

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.